728 A.2d 323 (1999)
321 N.J. Super. 186
In the Matter of PASSAIC COUNTY UTILITIES AUTHORITY PETITION Requesting Determination of Financial Difficulty and Application for Refinancing Approval.
City of Paterson and Martin G. Barnes, Plaintiffs-Appellants,
v.
Passaic County Board of Chosen Freeholders and Passaic County Utilities Authority, Defendants-Respondents, and
Township of Wayne, Borough of Totowa, Borough of West Paterson, City of Clifton, Borough of Wanaque, Borough of Bloomingdale, Borough of Hawthorne, Borough of Ringwood, Borough of Pompton Lakes, and Township of West Milford, Defendants/Intervenors-Respondents (Two Cases).
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1998.
Decided May 13, 1999.
*325 Sandra T. Ayres, Montclair, for plaintiffs-appellants (Schwartz, Tobia, Stanziale, Becker, Rosensweig & Sedita, attorneys; Ms. Ayres, Warren B. Kasdan, and William A. Baker, on the brief).
Benjamin Clarke, for defendant-respondent Passaic County Utilities Authority (DeCotiis, Fitzpatrick & Gluck, Teaneck, attorneys; Michael R. Cole, of counsel; Mr. Clarke, on the brief).
Leah C. Healey, Short Hills, for defendant-respondent Passaic County Board of Chosen Freeholders (Maraziti, Falcon & Healey, attorneys; Ms. Healey, on the brief).
Daniel P. Reynolds, Deputy Attorney General, for defendant-respondent Local Finance Board (Peter Verniero, Attorney General, attorney; Joseph L. Yannotti, Assistant Attorney General, of counsel; Mr. Reynolds and Leslie A. Rosenthal, Deputy Attorney General, on the brief).
John Fiorello, Wayne, for defendants/intervenors-respondents.
Saul, Ewing, Remick & Saul, Princeton, for amici curiae National Solid Waste Management Association, Waste Management Association of New Jersey, BFI Waste Systems of New Jersey, Inc., Super Kwik, Inc., USA Waste of New Jersey, Inc., and Waste Management of New Jersey, Inc. (Michael Lampert and Jane Kozinski, on the brief).
Before Judges PETRELLA, D'ANNUNZIO and CUFF.
*324 The opinion of the court was delivered by CUFF, J.A.D.
These consolidated appeals address the coordinated actions of the Passaic County Board of Chosen Freeholders (Passaic County) and the Passaic County Utilities Authority (PCUA) to assure repayment of debt issued by the PCUA. The ability of the PCUA to meet its debt obligations has been jeopardized by the invalidation of the State-imposed solid waste management plan and the consequent precipitous drop in revenue to the PCUA. We must determine whether the *326 Environmental Investment Charge (EIC)[1], an essential element of the PCUA's financial remediation plan approved by the Local Finance Board (LFB), and the 1997 Refunding Bond Deficiency Agreement (Deficiency Agreement) between Passaic County and the PCUA is authorized by the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1 to -69. We must also decide whether the Deficiency Agreement by which Passaic County agreed to guarantee the payment of unsecured revenue bonds issued by the PCUA in 1991 is an unconstitutional use of public funds for a private purpose. We commence with a discussion of the solid waste management plan in existence at the time the revenue bonds and project notes were issued by the PCUA, the rulings which invalidated key elements of the State solid waste management plan, the effect of this ruling on the PCUA, and the remedy fashioned by Passaic County and the PCUA to address the financial impact of these rulings.
The Solid Waste Management Act, N.J.S.A. 13:1E-1 to -207, and the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 to -13, were enacted in response to the growing disenchantment with the use of landfills to dispose of solid waste and the resultant need to develop and establish a coherent, efficient and environmentally suitable means of solid waste disposal. At the risk of oversimplification, these related statutory schemes established a rigid "flow control" scheme which controlled the collection, transportation and processing of solid waste generated in the State. The controls were administered by waste control districts. Each county and the Hackensack Meadowlands district are waste control districts. Each district was authorized to contract with a waste control facility to dispose of locally generated solid waste.
Passaic County adopted the Passaic County Solid Waste System in 1987. It has been administered by the PCUA since its inception. The County System provided for the disposal of solid waste generated within the county through the transhipment of waste at three transfer stations owned and operated by Pen Pac Inc, long-haul solid waste transportation services provided by Grinnell Solid Waste Haulers, Inc. and Spectrasen, Inc., and landfill disposal services furnished by Empire Sanitary Landfill, Inc. The County System is supported by a franchise granted to the PCUA by the Board of Public Utilities (BPU) and the New Jersey Department of Environmental Protection (DEP) by which the PCUA maintains the exclusive right by statute to control and provide for the disposal of solid waste generated within the County. The County System also contemplated the construction and operation of a resource recovery plant (an incinerator). Due to considerable controversy engendered by the decision to utilize an incinerator to dispose of solid waste, the incinerator was never built. Nevertheless, the PCUA issued temporary project notes and long term revenue bonds to fund the planning of the facility and other activities undertaken by the PCUA.
In 1987, the PCUA issued $57,998,886 in revenue bonds. This 1987 series was guaranteed by Passaic County. In 1992, a $30,930,000 bond issue refunded $29,595,000 of the 1987 series. In 1996, another bond issue refunded the remaining 1987 bonds. In 1991, the PCUA issued another series of revenue bonds. Payment of principal and interest of this $36,495,000 issue is limited to revenues generated by the activities of the PCUA; Passaic County did not guarantee the 1991 bond issue.
Relying on C & A Carbone, Inc. v. Town of Clarkstown, New York, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Court of Appeals for the Third Circuit in Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atl. County, 112 F.3d 652 (3d Cir.1997), amended by 135 F.3d 891 (3d Cir.1998), cert. denied sub nom. Essex County Utils. Auth. v. Atlantic Coast Demolition & Recycling, Inc., ___ U.S. ___, 118 S.Ct. 412, 139 L.Ed.2d 316 (1997), held that New Jersey's flow control statutes, rules and regulations governing the disposal of in-state solid waste violated the Commerce Clause of the United States Constitution insofar as they discriminate against out-of-state *327 solid waste facilities. Once the State's solid waste flow control scheme was declared unconstitutional, waste generators were no longer required to use facilities operated by counties or county utilities authorities, and many waste generators by-passed the county facilities. The invalidation of this State's solid waste flow control scheme has left many counties and county utilities authorities, such as the PCUA, with what has become known as "stranded debt." Stranded debt is outstanding public debt issued to fund facilities or activities which are now unutilized or underutilized due to the invalidation of a regulatory scheme which caused the facility to be built or the activity to be undertaken. The cessation or diminution of revenue from the facility or activity renders the debt underfunded or unfunded or "stranded." Here, the debt is underfunded due to the invalidation of the State's solid waste flow control system.
Stranded debt bears some similarity to "stranded costs." The concept of stranded costs has been encountered in the deregulation of utilities, primarily electric, gas and telecommunications. Under former regulatory schemes in which basic utility services were provided through a single provider whose level of service and rate schedule were approved by a central rate-making board, regulated utilities incurred certain costs. Some of these costs were incurred to build infrastructure required to deliver the service or to assure universal access to the service. The advent of competition in the industry impedes and in certain circumstances prevents the recovery of these costs. Thus, these unrecoverable costs are termed "stranded." See Massachusetts Inst. of Tech. v. Department of Pub. Utils., 425 Mass. 856, 684 N.E.2d 585, 587 n. 4 (1997). Considerable attention has been devoted to whether a mechanism should or must be constructed to allow recovery of some or all of these costs and, if so, the most appropriate response. See e.g. J. Gregory Sidak and Daniel F. Spulber, Deregulatory Takings and Breach of the Regulatory Contract, 71 N.Y.U. L.Rev. 851 (1996); William J. Baumol and J. Gregory Sidak, Stranded Costs, 18 Harv. J.L. & Pub. Pol'y 835 (1995); Leigh Martin, Note, Deregulatory Takings: Stranded Investments and the Regulatory Compact in a Deregulated Electric Utility Industry, 31 Ga. L.Rev. 1183 (1997).
In response to the Atlantic Coast decision, DEP responded in August 1997 by issuing a document titled "Guidance Document in Response to the May 1, 1997 Court Decision on Solid Waste Flow Control" (hereafter "guidance document"). The guidance document includes the following questions and answers in the beginning of the section labeled "EIC Questions":
Question: What is the legal authority to impose an EIC?
Answer: The legal authority to impose an EIC derives from each authority's enabling statutes. See, N.J.S.A. 40:14B-1 et seq. (Municipal and County Utilities Authorit[ies] Law); N.J.S.A. 40:37A-1 et seq. In addition, the Local Finance Board has broad authority to order the imposition of fees and/or charges necessary for local government entities in financial difficulty to assure satisfaction of outstanding obligations (N.J.S.A. 40A:5A-18 & 19), and the DEP has broad authority over solid waste utility rates to ensure adequate and proper service, N.J.S.A. 48:13A-1 et seq.

Question: Will the EIC charge be approved by the DEP or the Local Finance Board or both agencies?
Answer: The EIC will be reviewed by the DEP to assure that it is consistent with the local government entity's obligation to assess just and reasonable charges. The Local Finance Board will review the EIC to ensure that it is sufficient for the local government entity to meet its financial obligations. A single county plan amendment can be prepared for submission to DEP for its review.
Question: What eligible charges may be contained within an EIC?
Answer: The most certain component of an EIC is debt service. Other potentially acceptable components of an EIC charge include host community benefits, state taxes (Solid Waste Services Tax and Landfill Closure and Contingency Fund Taxes), system-wide rate components, and standby operating costs (minimal operating costs required to keep a facility open).
*328 Shortly after issuing the August 1997 guidance document, the DEP adopted emergency regulations to address the Atlantic Coast decision. 29 N.J.R. 4170(a) (Sept. 15, 1997). The regulations call for solid waste districts to adopt solid waste management plan amendments setting forth "[t]he method of financing solid waste management in the district, including any mechanism to be instituted by the district for ensuring the payment of outstanding debt and other financial obligations." N.J.A.C. 7:26-6.10(b)(6). In its published comments during the comment period, the DEP emphasized that the EIC would be an acceptable mechanism to satisfy this obligation. 29 N.J.R. 5084(a), 5087 (Dec. 1, 1997).
Since the denial of certiorari in Atlantic Coast on November 10, 1997, the PCUA has been unable to require the municipalities within the County of Passaic to use the in-county private transfer stations that were part of its former waste flow system. None of the municipalities in the County of Passaic now use the PCUA's system because they have all found cheaper providers. However, unlike some other county utilities authorities, the PCUA owns no solid waste facilities. Thus, it has few assets which may be sold to satisfy its debt.[2]
Acting in concert, the PCUA and Passaic County devised a plan to assure repayment of the debt incurred to effectuate the invalidated State solid waste management plan. The focal point of this plan is the issuance of refunding bonds not to exceed $50,000,000 which will refund $21,400,000 of the approximate $27,000,000 balance from the 1991 revenue bond series, and other bond issues which were backed by the County of Passaic when issued. The newly issued bonds will be repaid from the EIC which will be levied on all prior users of PCUA services in accordance with 1993 municipal tonnage figures. Any shortfall will be covered by the County of Passaic pursuant to the terms of a Deficiency Agreement.
On November 12, 1997, Passaic County approved the Deficiency Agreement which provides that the PCUA will provide solid waste services to the County of Passaic and, in return for those services, the County will pay to the PCUA an amount equal to any shortfall in revenue which the PCUA may experience. On December 17, 1997, the County approved an amendment to the 1997 Deficiency Agreement, whereby the County agreed to secure the balance of the 1991 bonds that are not refunded with the proceeds of the refunding bonds.
On November 19, 1997, the PCUA filed an application with the LFB of the Department of Community Affairs pursuant to section 6 of the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-6, for approval of its refinancing proposal to issue up to $40,165,000 in refunding bonds using the EIC and the Deficiency Agreement to secure the debt service. On the same date, the PCUA filed a petition with the LFB, pursuant to N.J.S.A. 40A:5A-18 and -19, requesting a determination of financial difficulty and an order requiring implementation of the proposed EIC to alleviate the financial difficulty.
In its resolution approving the financing, the LFB found that the PCUA is experiencing and will continue to experience financial difficulties which jeopardize the payment of debt service on issued obligations and that these difficulties will likely impair the credit of the PCUA and the County of Passaic. To remedy this situation, the LFB approved the financial plan submitted by the PCUA. This plan includes the assessment of an EIC over a ten-year period.
The EIC submitted by the PCUA and approved by the LFB is an allocation of the PCUA's total debt (including $28 million in unsecured debt) which, along with an administrative fee, is being imposed on a per ton basis on all municipalities in the County of Passaic based on their 1996 municipal waste generation, and on all commercial and industrial generators based on their average flows *329 from 1993 through 1996. It is imposed on an annual basis with different amounts due.
On January 6, 1998, the City of Paterson and Martin G. Barnes, a City resident and taxpayer, filed a six count action in lieu of prerogative writ in the Law Division in which they sought various relief, including an order declaring Passaic County's Deficiency Agreement with the PCUA unconstitutional, null and void, and preliminary and permanent injunctive relief restraining Passaic County from acting in accordance with the Deficiency Agreement by guaranteeing payment of the previously issued bonds and the refunding bonds. In addition, on January 7, 1998, plaintiffs filed a Notice of Appeal from the December 16, 1997 action of the LFB. When the LFB granted the PCUA's supplemental application to increase the amount of refunding bonds to enable refunding of an additional $6,500,000 of the 1991 revenue bonds, plaintiffs filed an amended Notice of Appeal. In addition, on January 16, 1998, plaintiffs filed a four count action in lieu of prerogative writ against Passaic County and the PCUA challenging Passaic County's adoption of an amendment of its District Solid Waste Management Plan. The amendment reflected the refunding authorized by the LFB, including the assessment of the EIC.
In 1998, the City of Paterson received a notice of EIC obligation. The 1998 EIC rate is $29.64 per ton. Its ten year EIC obligation is $20,704,613. Its 1998 EIC obligation is $2,500,122, payable quarterly. Upon receipt of its EIC bill, plaintiffs amended their initial complaint to directly challenge the authority of the PCUA to impose an EIC.
Judge Reisner entered an order dated February 20, 1998, to permit intervention by the following municipalities: Township of Wayne, Borough of Totowa, Borough of West Paterson, City of Clifton, Borough of Wanaque, Borough of Bloomingdale, Borough of Hawthorne, Borough of Ringwood, Borough of Pompton Lakes, and Township of West Milford.[3] On March 4, 1998, Judge Reisner consolidated both prerogative writ actions. In a separate order, she transferred the consolidated action to this court.[4] Plaintiffs filed a Notice of Appeal of the transfer order.
On appeal, plaintiffs assert: (1) the PCUA's EIC is ultra vires and an unauthorized and unconstitutional county tax, thereby unenforceable as a matter of law; (2) the 1997 Deficiency Agreement is unconstitutional, an unauthorized and arbitrary county guarantee of the PCUA's unsecured debt, and contrary to public policy, and, therefore, void and unenforceable; (3) the LFB resolution on the EIC is, insofar as it purports to authorize the PCUA to make such an assessment, ultra vires, and, thus, unenforceable as a matter of law; (4) the LFB resolutions on the PCUA's refinancing applications have no legal force and effect with respect to the 1997 Deficiency Agreement; and (5) the judge erred as a matter of law in transferring plaintiffs' suit against Passaic County regarding its decision to enter into the 1997 Deficiency Agreement to the Appellate Division. Initially, we will discuss whether Judge Reisner erred by transferring the consolidated prerogative writ actions to this court.

I
Judge Reisner transferred the consolidated prerogative writ cases pursuant to R. 1:13-4(a). This rule provides:
[I]f any court is without jurisdiction of the subject matter of an action or issue therein... it shall, on motion or on its own initiative, order the action, with the record and all papers on file, transferred to the proper court ... in the State. The action shall then be proceeded upon as if it had been originally commenced in that court....
Citing Pascucci v. Vagott, 71 N.J. 40, 362 A.2d 566 (1976), Judge Reisner concluded that the entire consolidated case should be transferred to this court. She ruled that plaintiffs' challenge to the EIC could not be entertained by the Law Division because the *330 EIC has been imposed by a final order of the LFB, a state agency. Under R. 2:2-3(a)(2), parties must bring challenges to final decisions or actions of state administrative agencies in the Appellate Division.
Addressing the Deficiency Agreement, the judge stated that it is one component of the project financing that was approved by the LFB. She explained: "The County's approval of the Agreement was in place when the LFB rendered its decision and was an integral part of the project financing which the LFB approved as being necessary to avoid default on the PCUA's outstanding bonds." She further stated that the LFB's decision appeared to be key to a court's decision whether the Deficiency Agreement serves a public purpose and whether the agreement violates the New Jersey Constitution. Since the Law Division has no jurisdiction to review the LFB's decision, all the "component parts" belong in the Appellate Division.
Judge Reisner explained that even if one aspect of the controversy could be heard in the Law Division, because another portion could only be heard in the Appellate Division, the entire controversy should be heard here. She emphasized that plaintiffs characterized the EIC issue in submissions before the Law Division, the LFB, and the Appellate Division as being intertwined with the issue of the validity of the Deficiency Agreement and the bond refinancing.
Finally, Judge Reisner held that transfer of plaintiffs' challenge to the amendment of the District Solid Waste Management Plan was required by the entire controversy doctrine. She observed that the complaint raised the same legal issues as the other transferred action: legality and constitutionality of the Deficiency Agreement and validity of the EIC.
On appeal, plaintiffs only challenge the transfer order as it pertains to the 1997 Deficiency Agreement and seek reversal only in the event this court does not declare the agreement unconstitutional and in violation of the Municipal and County Utilities Authorities Law. They contend that in order to transfer their challenge to the 1997 Deficiency Agreement, the trial court had to find, and inferentially we must agree, that the LFB had exclusive or, at least, primary jurisdiction.
We conclude that Judge Reisner properly transferred the entirety of the consolidated cases to this court. Having declared the PCUA in a condition of financial difficulty, the LFB simultaneously approved a remedy proposed by the PCUA and ordered implementation of that remedy. Review of this agency action is exclusively in this court. R. 2:2-3(a)(2). The EIC and the Deficiency Agreement are cornerstones of the plan and any ruling by this court concerning the authority of the LFB to impose the EIC or to require the Deficiency Agreement, the authority of the PCUA to assess the EIC, and the constitutionality of the Deficiency Agreement will control the same elements challenged in the prerogative writ actions. Indeed, the prerogative writ actions can be viewed as a disguised challenge to the LFB action, because the EIC and the Deficiency Agreement are integral parts of the remedy approved and imposed by the agency.

II
Plaintiffs assert that the EIC authorized by the LFB and levied by the PCUA is an unauthorized county tax and there is no statutory authority for the imposition of the EIC. Defendants counter that the EIC falls within the definition of a solid waste service charge. Assuming it is an authorized service charge, we must determine whether the appropriate procedure for imposition of a revised or restated service charge has been followed.
In 1957, the Legislature enacted the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1 to -69, to foster and promote all reasonable means for the provision and distribution of adequate water supply, the collection, disposal and recycling of solid waste in an environmentally sound manner, and the control of pollution of the land and water in and near this State. N.J.S.A. 40:14B-2. To further this policy, the statute authorizes service charges to occupants and owners of property for the direct and indirect use of the services of such authorities and *331 financing of such services. N.J.S.A. 40:14B-2(2), (4). A "service charge" includes a solid waste service charge as defined by statute. N.J.S.A. 40:14B-22.1 refers to the rents, rates, fees or other charges for the use or service of the solid waste system as solid waste service charges.
Section 22.1 further provides:
Such solid waste service charges may be charged to and collected from any municipality or any person contracting for such use or services or from the owner or occupant, or both of them, of any real property from or on which originates or has originated any solid waste to be treated by the solid waste system of the authority.... Such rents, rates, fees and charges, being in the nature of use or service charges, shall as nearly as the authority shall deem practicable and equitable be uniform throughout the county for the same type, class and amount of use or service of the solid waste system, ... and may be based or computed on any factors determining the type, class and amount of use or service of the solid waste system, and may give weight to the characteristics of the solid waste and any other special matter affecting the cost of treatment and disposal of the same.
[N.J.S.A. 40:14B-22.1 (emphasis added).]
Further, section 23 provides that the service charges imposed by a county authority must be sufficient to meet all expenses, including debt service. It provides:
Every municipal authority shall prescribe and ... when necessary revise a schedule of all its service charges ... such that the revenues of the ... authority will at all times be adequate to pay the expenses of operation and maintenance of the utility system, including reserves, insurance, extensions, and replacements, and to pay the principal of and interest on any bonds and to maintain such reserves or sinking funds therefor as may be required by the terms of any contract of the ... authority or as may be deemed necessary or desirable....

[N.J.S.A. 40:14B-23.]
The establishment or revision of any service charge must be preceded by notice and a public hearing at which the authority must provide evidence that the proposed adjustment of the service charge is necessary and reasonable. Ibid. The statute shall be construed liberally to effectuate the legislative intent. N.J.S.A. 40:14B-68. Reahl v. Randolph Township Mun. Utils. Auth., 163 N.J.Super. 501, 511-14, 395 A.2d 241 (App. Div.1978), certif. denied, 81 N.J. 45, 404 A.2d 1146 (1979).
Our analysis of N.J.S.A. 40:14B-22.1 reveals three criteria for a charge or fee to be considered a solid waste service charge. First, the body imposing the charge must be a municipal authority as defined by the County and Municipal Utilities Authorities Law. Second, the charge must be for authorized expenses. Third, it must be for use or service of a solid waste system.
It is undisputed that the PCUA constitutes a municipal authority as defined by the statute. N.J.S.A. 40:14B-3(5). Further, our review of the several statutes governing charges which a municipal authority may impose, particularly N.J.S.A. 40:14B-22.1, reveals that a solid waste service charge is composed of two elements. The first element is a charge for the current operation and maintenance of the solid waste collection and disposal facilities. The second element is a charge to cover debt service.
As to the third criteria, plaintiffs argue that the statutory language limits a solid waste service charge solely to waste currently treated and current users. In support of its position, they focus on the "to be treated" language of N.J.S.A. 40:14B-22.1 which authorizes the imposition of a service charge. They contend that this language allows a service charge only for treatment of waste presently in the waste disposal system and by extension only to users presently using the PCUA services. However, this argument ignores the language in the same section which allows a service charge to any municipality or person which "originates or has originated any solid waste." This language, in addition to the dual elements of the solid waste service charge, current expenses and debt service, leads us to conclude that the EIC is authorized by statute as an *332 element of a fee and specifically a solid waste service charge as authorized by section 22.1.
As devised, presented and approved by the LFB, the EIC is a fee to cover debt service. In fact, the LFB specifically described the EIC as a charge "to assure that the debt service that was incurred to provide the Solid Waste System for the use of such solid waste generators is paid." Indeed, the LFB directed the PCUA to remove from the proposed EIC charge administrative expenses attributable to current operations of the PCUA. As a result, the proposed EIC rate of $31 per ton was reduced to $28.64 per ton.
As such, we must reject plaintiffs' contention that the EIC is a tax rather than a permitted service charge. A tax has been defined as an annual, recurring pecuniary assessment imposed on persons or property to support government. Efros v. Russo, 68 N.J.Super. 110, 112, 171 A.2d 370 (Law Div. 1961), rev'd on other grounds, 71 N.J.Super. 602, 177 A.2d 565 (App.Div.1962). By contrast, a fee is imposed under the government's power to regulate. A fee is not a tax as long as the amount of the fee bears a reasonable relationship to the cost incurred by the government to regulate. New Life Gospel Church v. Department of Community Affairs, 257 N.J.Super. 241, 246, 608 A.2d 397 (App.Div.), certif. denied, 133 N.J. 429, 627 A.2d 1136 (1992). Measured by this standard, expenses incurred by the DEP associated with its administration of its duties under the Spill Act and allocated to responsible parties were considered a fee rather than a tax. E.I. du Pont de Nemours & Co. v. State of New Jersey, 283 N.J.Super. 331, 341-43, 661 A.2d 1314 (App.Div.1995).
Plaintiffs argue, however, that notwithstanding the language of section 22.1, a service charge may only be imposed on current users of the system. In support of this argument they rely on Airwick Indus., Inc. v. Carlstadt Sewerage Auth., 57 N.J. 107, 270 A.2d 18 (1970), app. dismissed, cert. denied, 402 U.S. 967, 91 S.Ct. 1666, 29 L.Ed.2d 132 (1971) and Ivan v. Marlboro Township Mun. Utils. Auth., 162 N.J.Super. 466, 467-69, 393 A.2d 598 (App.Div.1978). Neither case, however, precludes the imposition of the EIC contemplated by the PCUA.
In Airwick Indus., property owners contested the schedule of sewer charges imposed on them. One of the charges contested by the property owners was a connection charge which increased annually for subsequent connectors to the system. Plaintiffs seize on the following language in the Court's discussion of the graduated connection charge to support their argument that the EIC may be imposed only on current users of the PCUA solid waste facility. The Court said:
It is apparent that there should be two sources from which to raise the funds required for said purposes in order that the charges remain "equitable" and "uniform." Those properties actually using the system should alone absorb the cost of "operation and maintenance," since the expenditures for such purposes arise solely from that use.
[Airwick Indus., 57 N.J. at 120, 270 A.2d 18.]
We conclude, however, that plaintiffs' reliance on this language is occasioned by undue emphasis on one element of the Court's decision.
As related in Airwick Indus., Carlstadt imposed a connection fee schedule which escalated each year. If a property owner connected to the sewer system, in the first year the fee was $1,500. The connection fee increased by $1,500 each year until a property owner would pay $5,000 if it connected in the fourth year or any time after the third year the property owner was notified of the availability of the system. Id. at 111-12, 270 A.2d 18. The Court held that the staggered connection fee was valid noting that the debt had been incurred to provide the service, the property incurred a benefit due to the availability of the service and it was the only equitable manner to distribute the debt load. Id. at 121, 270 A.2d 18.
In reaching this conclusion, the Court noted that there are two sources from which to raise the funds necessary to carry the expenses of the system: first, current users of the system and second, all properties where service is available, whether actually using the system. Id. at 120, 270 A.2d 18. In recognition of the development potential *333 conferred on property for which service is available, the Court concluded that participation in the cost of the debt to construct the facilities by the property owners through the mechanism of a progressively increasing connection fee was an equitable approach, even though the unconnected property owner did not receive actual service. Ibid. It is in this context that the Court observed that only current users should pay the current expenses for operation and maintenance of the system.
Actually, Airwick Indus. provides more support for the PCUA's position than plaintiffs' position because the decision is infused with the Court's recognition that the ordinary expenses of a utility authority are composed of current operating costs and the cost of the debt incurred to construct the facility as well as the recognition that a utility has the authority to equitably distribute the debt among actual users and potential users of the facility.
To be sure, Airwick Indus. involved a mechanism to distribute debt service over current and future users. Moreover, the allocation of expenses of a sewer authority is not wholly analogous to the costs of a utility, such as solid waste collection and disposal, for which there is a readily available private provider of the same service. Nevertheless, Airwick Indus. recognizes the need to cover debt occasioned by withdrawal or cessation of activities. Id. at 113-14, 270 A.2d 18.
Furthermore, Ivan v. Marlboro Utils. Auth., provides no support for plaintiffs' argument. In Ivan, the property owner had not connected to the municipal water system. This court barred the utility authority from imposing a minimum consumption charge, which represented a charge the court determined was solely for current operating costs. Therefore, the factual situation in Ivan is distinguishable.
Moreover, in Wanaque Borough Sewerage Auth. v. West Milford, 144 N.J. 564, 677 A.2d 747 (1996), the Court held that a municipality which had participated in the planning stages of a regional sewer authority but withdrew before services were installed or provided was liable for a proportionate share of certain expenses incurred in the planning stages before its withdrawal. The Court imposed this liability according to a quasi-contract theory. Id. at 575-76, 677 A.2d 747.
Notably, the Court recognized that benefits were received by the withdrawn municipality through its participation even though the project was eventually aborted. Id. at 576, 677 A.2d 747. Moreover, the Court recognized the need to fashion a remedy to equitably allocate the incurred expenses to assure that the entire financial burden would not fall upon a small sector of the community. Id. at 577-78, 677 A.2d 747.
Despite the language of section 22.1, plaintiffs contend that sections 33 and 49 of the Municipal and County Utilities Authorities Law preclude the imposition of an EIC. N.J.S.A. 40:14B-33 provides:
Neither the members of the municipal authority nor any person executing bonds issued pursuant to this act shall be liable personally on the bonds by reason of the issuance thereof. Bonds or other obligations issued pursuant to this act shall not be in any way a debt or liability of the State, and bonds or other obligations issued by a municipal authority pursuant to this act shall not be in any way a debt or liability of the State or of any local unit or of any county or municipality and shall not create or constitute any indebtedness, liability or obligation of the State or of any such local unit, county or municipality, either legal, moral or otherwise, and nothing in this act contained shall be construed to authorize any municipal authority to incur any indebtedness on behalf of or in any way to obligate the State or any county or municipality.
We conclude, however, that plaintiffs' reliance on this section is misplaced. Section 33 simply establishes that a municipal authority and the public entity which established it are separate entities. It does not preclude a municipal authority from making adequate provision for payment of debt service.
Contrary to plaintiffs' position, N.J.S.A. 40:14B-49 does not preclude the imposition of a charge without the provision of current services. Rather, it simply authorizes a municipality to contract with an *334 authority to provide solid waste services for a payment in lieu of some or all of a service charge which may contain a provision as to the financing and payment of expenses incurred by the authority to provide the service.
Finally, plaintiffs contend that Assembly Bill No. 50 (A-50) introduced in 1997 provides clear evidence of the lack of statutory authority for the EIC. A-50 would have provided specific authorization for the imposition of the EIC.[5] A-50, however, was never enacted. Reliance on proposed or pending legislation to interpret existing statutes is of little value. Indeed, in Masse v. Board of Trustees, Pub. Employees' Retirement Sys., 87 N.J. 252, 264, 432 A.2d 1339 (1981), the Court commented that "[i]nsofar as legislative intent is concerned inaction demonstrates nothing more than that subsequent legislatures failed to act." See also 2B Sutherland, Statutory Construction § 49.10 at 76-78 (5th ed.1992).
Having concluded that the EIC qualifies as a solid waste service charge pursuant to the Municipal and Counties Utilities Authorities Law, we must determine whether the PCUA followed the prescribed procedure for the adjustment or revision of any service charge. Citing N.J.S.A. 40:14B-23, plaintiffs assert that the EIC was not established in accordance with prescribed procedures. We disagree.
N.J.S.A. 40:14B-23 provides:
Every municipal authority shall prescribe and from time to time when necessary revise a schedule of all its service charges, which may provide a single rent, rate, fee or charge for any of its utility charges and which shall comply with the terms of any contract of the municipal authority and may be such that the revenues of the municipal authority will at all times be adequate to pay the expenses of operation and maintenance of the utility system, including reserves, insurance, extensions, and replacements, and to pay the principal of and interest on any bonds and to maintain such reserves or sinking funds therefor as may be required by the terms of any contract of the municipal authority or as may be deemed necessary or desirable by the municipal authority. Said schedule shall thus be prescribed and from time to time revised by the municipal authority after public hearing thereon which shall be held by the municipal authority at least 20 days after notice of the proposed adjustment is mailed to the clerk of each municipality serviced by the authority and publication of notice of the proposed adjustment of the service charges and of the time and place of the public hearing in at least two newspapers of general circulation in the area serviced by the authority. The municipal authority shall provide evidence at the hearing showing that the proposed adjustment of the service charges is necessary and reasonable, and shall provide the opportunity for cross-examination of persons offering such evidence, and a transcript of the hearing shall be made and a copy thereof shall be available upon request to any interested party at a reasonable fee. The municipal authority shall likewise fix and determine the time or times when and the place or places where such service charges shall be due and payable and may require that such service charges shall be paid in advance for periods of not more than one year. A copy of such schedule of service charges in effect shall at all times be kept on file at the principal office of the municipal authority and shall at all reasonable times be open to public inspection.
We have not been provided with a copy of any notices or a transcript of the required public hearing. However, we note that the transcript of the hearing before the LFB refers to a hearing conducted in conjunction *335 with the amendment to the county solid waste management plan as required by N.J.S.A. 13:1E-23 and N.J.A.C. 7:26-6.10(c), prior to submission of the plan amendment to DEP and a special meeting of the PCUA on November 15, 1997. The record before the LFB demonstrates that the proposed EIC was presented and the views of all municipalities were received at this special meeting. The record further reflects all municipalities were represented at this meeting.
Although we are unable to discern whether the special meeting was specifically contemplated as the hearing required by section 23, the record clearly reflects substantial compliance with the requirement for prior notice and an opportunity to comment. Notably, as a result of the hearings attendant to the submission of the plan amendment to the DEP and the financial plan to the LFB, the amount of the EIC as proposed was trimmed from $47.94 per ton to $31 per ton.[6] Furthermore, all affected entities received notice of and many participated at the hearings conducted by the LFB. Under these circumstances, we conclude that the several opportunities for public comment afforded all affected parties substantially complies with the section 23 notice and comment requirement.

III
Plaintiffs further contend that section 19 of the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-19, neither explicitly nor implicitly authorizes the LFB to impose an EIC. They further maintain that imposition of an EIC is contrary to section 12 of the Act, N.J.S.A. 40A:5A-12, and that the LFB's power embraces only the power to order compliance with an existing service contract or to order an increase in an authority's fees and charges authorized under the Municipal and County Utilities Authorities Law. For the reasons expressed in this opinion, however, we are satisfied that the EIC is an authorized charge pursuant to section 22.1 of the Municipal and County Utilities Authorities Law. As such, we need not determine whether the LFB may independently devise and impose a charge not otherwise permitted or contemplated by the public entity's enabling legislation. Moreover, in the context of a public entity with statutory authority to impose an EIC, we conclude that approval by the LFB of an EIC as part of a plan to remedy financial difficulty is within the broad powers conferred on the LFB to assure the financial stability of the PCUA.

IV
Plaintiffs claim that the 1997 Deficiency Agreement is unconstitutional, an unauthorized and arbitrary county guarantee of the PCUA's debt, and contrary to public policy. Initially, we address whether the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-33, prohibits the obligation undertaken by Passaic County. Then, we will address the constitutionality of the agreement.
As part of its refunding plan, Passaic County and the PCUA executed the Deficiency Agreement on November 12, 1997, to secure the refunded system revenue bonds and the bonds issued to refund approximately $11,000,000 of project notes issued in 1997. The security offered by the Deficiency Agreement is intended to be secondary to the proceeds of the EIC imposed on the various municipalities which utilized PCUA services in accordance with the county solid waste management plan. In other words, Passaic County will be required to contribute to the debt service only if the revenue generated by the EIC is insufficient.
In support of their argument that the Deficiency Agreement is statutorily barred, plaintiffs rely on N.J.S.A. 40:14B-33. Section 33 provides:
Bonds or other obligations issued pursuant to this act shall not be in any way a debt or liability of the State, and bonds or other obligations issued by a municipal authority pursuant to this act shall not be in any way a debt or liability of the State or of any local unit or of any county or municipality and shall not create or constitute any indebtedness, liability or obligation of the State or of any such local unit, county or *336 municipality, either legal, moral or otherwise....
We construe this statute as no more than a statutory recognition that the various entities authorized to issue debt are separate entities and that none of the other entities can be considered responsible for that debt. See Marino v. Zdanowica, 66 N.J.Super. 512, 518, 169 A.2d 517 (Law Div.1961). Furthermore, we do not construe this section to preclude one entity from providing additional security, such as in the form of an agreement to cover from time to time any revenue shortfall. We do not read De Lorenzo v. City of Hackensack, 9 N.J. 379, 88 A.2d 511 (1952) to bar such secondary security.
In De Lorenzo, the City of Hackensack created a parking authority, the purpose of which was to provide off-street parking. In conjunction with its plans to construct several off-street parking facilities, the parking authority proposed to issue bonds. The debt service was to be paid from revenue generated from users of the facilities. Id. at 382-83, 88 A.2d 511. In conjunction with the bond offering, the parking authority and the City entered an agreement in which the City agreed to lease the land acquired by the authority and the facilities constructed thereon and to pay fixed annual rentals for thirty years. Ibid. The annual rent would be deposited with a trustee who could draw on this rent in the event of a revenue shortfall from the parking facilities. Ibid. Interestingly, this agreement was unaccompanied by an ordinance recognizing and approving this obligation or a current appropriation. Id. at 383, 88 A.2d 511.
The Court concluded that this arrangement was a thinly disguised guarantee which was not contemplated by the statute authorizing cities to establish parking authorities and bestowing on these authorities various powers precluded by this arrangement. Id. at 388, 88 A.2d 511. In reaching this conclusion, the Court relied on language virtually identical to section 33 of the Municipal and County Utilities Authorities Law. Id. at 387, 88 A.2d 511.[7]
On the other hand, the Court recognized the ability of the City to lend or grant funds from time to time to the same parking authority and to pledge such loans or grants by the authority as additional security for the authority bonds. It said:
[N.J.S.A. 40:11A-21] may be said to express the legislative contemplation that the municipality may properly lend or grant money or agree to take such action from funds currently appropriated or otherwise actually available for distribution; and under [N.J.S.A. 40:11A-8] grants thus made within section 21 may be pledged by the authority as additional security on its bonds. This interpretation enables fair attainment of the legislative purpose that the parking project be financed through revenue bonds of the authority with such incidental aid as the municipality may be in a position properly to furnish from time to time.
[Id. at 388-89, 88 A.2d 511.]
Our review of the Deficiency Agreement leads us to the conclusion that the obligation undertaken by Passaic County concerning the PCUA debt is more akin to the transitory as needed grant or loan approved by De Lorenzo, rather than the guarantee condemned by De Lorenzo. Unlike De Lorenzo, Passaic County is not obliged to pre-pay any sum which is to be held in trust. Rather, its obligation is secondary and is not contemplated as a recurring obligation. See also Graziano v. Mayor and Township Comm. of Montville Township, 162 N.J.Super. 552, 394 A.2d 103 (App.Div.), certif. denied, 79 N.J. 462, 401 A.2d 219 (1978) (service contract between municipal utilities authority and municipality does not constitute assumption of liability of authority debt). Having concluded that section 33 does not bar the Deficiency Agreement, we consider its constitutionality.
Plaintiffs assert that the 1997 Deficiency Agreement violates the donation clause of the New Jersey Constitution. They contend that Passaic County's commitment to the *337 1997 Deficiency Agreement to pay the PCUA's debt on 1991 revenue bonds is an unconstitutional gift to the bondholders at public expense. N.J. Const., art. VIII, § 3, ¶¶ 2-3 provide:
2. No county, city, borough, town, township or village shall hereafter give any money or property, or loan its money or credit, to or in aid of any individual, association or corporation, or become security for, or be directly or indirectly the owner of any stock or bonds of any association or corporation.
3. No donation of land or appropriation of money shall be made by the State or any county or municipal corporation to or for the use of any society, association or corporation whatever.
Generally, these sections prohibit the use by loan or gift of public money or the credit of a local government for private benefit. The local government debt and credit limits, as well as the State debt and credit limits, arose in response to abuses in the financing of railroads and other improvements. Roe v. Kervick, 42 N.J. 191, 206-07, 199 A.2d 834 (1964). Williams, The New Jersey Constitution: A Reference Guide 119 (1990). Professor Williams observes that "the basic thrust of [these] provisions is that `public money is used for public purposes.'" Williams, supra, (quoting Township of Mount Laurel v. Department of Public Advocate, 83 N.J. 522, 534, 416 A.2d 886 (1980)).
In Roe v. Kervick, supra, the Court emphasized that the question of public purpose must be answered by reference to the circumstances of a given case. The Court stated:
The concept of public purpose is a broad one. Generally speaking, it connotes an activity which serves as a benefit to the community as a whole, and which, at the same time is directly related to the functions of government. Moreover, it cannot be static in its implications. To be serviceable it must expand when necessary to encompass changing public needs of a modern dynamic society. Thus it is incapable of exact or perduring definition. In each instance where the test is to be applied the decision must be reached with reference to the object sought to be accomplished and to the degree and manner in which the object affects the public welfare.
[Roe v. Kervick, supra, 42 N.J. at 207, 199 A.2d 834 (citations omitted).]
Plaintiffs rely on the Court's statement that where public monies are at stake, an arrangement of benefit to private parties must be closely examined to discern whether such a benefit is in fact only incidental to a demonstrable and paramount public benefit. Id. at 223, 199 A.2d 834. Plaintiffs contend that the 1997 Deficiency Agreement does not withstand such scrutiny.
Plaintiffs maintain that by design, express purpose, and undeniable effect, the agreement would have Passaic County assume the risk of a $28 million obligation in order to guarantee payment to the holders of the PCUA's 1991 revenue bonds. Plaintiffs correctly add that in the absence of the 1997 Deficiency Agreement, neither Passaic County nor its taxpayers have any liability or obligation on the 1991 revenue bonds, and the bondholders do not have any contractual expectation of such payments. Plaintiffs also assert that the negative effects of any default on the PCUA are sheer speculation. Moreover, they emphasize that the bondholders have assumed any risk of non-payment.
The PCUA cites several public purposes served by the Deficiency Agreement. It maintains that the refinancing plan serves at least three important governmental interests: reducing the cost of the PCUA's debt service; preserving the County's and the PCUA's credit rating; and protecting the financial interests of the PCUA's present debtholders. It says that the County has an interest in avoiding any debt default by the PCUA, not only because the County stands behind a substantial amount of the PCUA's bonds, but also because of the damage that such a default would do to the County's own standing in the bond market.
Unquestionably, the Legislature has announced on many occasions that it is the public policy of this State that any and all public debt should be paid. Primary evidence of this often-repeated principle is the Local Authorities Fiscal Control Law, *338 N.J.S.A. 40A:5A-1 to -27, which not only states but also implements this policy in unambiguous terms. N.J.S.A. 40A:5A-2 expressly states
it to be in the public interest of the citizens of this State to maintain, support, foster, and promote the financial integrity and stability of local authorities in the State and of counties and municipalities served by these local authorities, by providing for State review of project financing of local authorities and for State supervision over the financial operations of local authorities.
N.J.S.A. 40A:5A-6f provides the LFB must review proposed financing, which review includes a consideration of the ability of the authority to pay the debt service. The LFB may also make specific recommendations concerning proposed project financing. N.J.S.A. 40A:5A-8. Moreover, in the event of financial difficulty, the LFB shall order the implementation of a fiscal plan which assures the payment of debt service on outstanding obligations of the authority. N.J.S.A. 40A:5A-19. Further, if the LFB orders dissolution of an authority, the dissolution plan must make adequate provisions for the payment of debt. N.J.S.A. 40A:5A-20.
The Municipal and County Utilities Authorities Law also contains similar statements of the legislative concern that debt obligations must be paid. N.J.S.A. 40:14B-2(4) specifically states that it is the policy of the State to provide "for the payment and security" of bonds issued by local authorities. In addition, N.J.S.A. 40:14B-64 provides that the State will not impair the rights and remedies of holders of any bonds issued pursuant to a bond resolution of a municipal authority.
These various statutory provisions exemplify the Legislature's conclusion that public debt obligations which are soundly conceived and fiscally responsible serve the public purpose. Such debt offerings, as well as prompt and reasonable remedies to unforeseen financial difficulties, assure access to private funds at reasonable rates to initiate or continue public services. We also cannot conclude that measures taken to provide secondary security to avoid default on outstanding debt obligations do not serve a public purpose. To be sure, the ramifications of a default are unknown. In that sense, the parade of horribles sought to be avoided by the Deficiency Agreement is founded on speculation. However, we question whether we must experience a default and its ramifications before we take measures to avoid such an occurrence. Even a temporary reluctance of private investors to purchase obligations of a Passaic County public entity may mean extra cost to taxpayers. While the particular project may not be aborted or delayed, at least on a temporary basis the cost of any borrowing is likely to be greater.
The New Jersey Constitution does not prohibit incidental private benefit. It also does not require absolute certitude that the financing employed serves a public purpose. As long as the basic purpose furthers the public interest, the Constitution is not offended. Accordingly, we do not find the Deficiency Agreement an unconstitutional use of public funds for a private purpose.
In summary, we conclude that Judge Reisner properly transferred all of the cases filed in the Law Division to this court. We also find that the EIC is authorized by the Municipal and County Utilities Authorities Law and the Deficiency Agreement does not violate the New Jersey Constitution or New Jersey law.
Affirmed.
NOTES
[1] The EIC is a charge designed to generate funds to assure payment of debt incurred by utility authorities to fund local implementation of State solid waste management policies.
[2] At oral argument, counsel advised the court that the PCUA may qualify to receive a small amount of the funds generated by a bond issue authorized by the voters at the November 3, 1998 general election. We are advised, however, that any funds received by the PCUA from this bond issue will still leave substantial debt unsatisfied.
[3] This court consolidated plaintiffs' appeal from the transfer order with plaintiffs' appeal of the LFB action and on April 8, 1998, consolidated these actions with the transferred prerogative writ actions.
[4] Counsel for the Township of Wayne has been designated as head counsel by order of this court dated April 2, 1998.
[5] We also note the introduction of two other pieces of legislation which have been introduced in the current legislative term. A-1889 would prohibit the imposition or collection of an EIC for 180 days after enactment to provide the Legislature the opportunity to develop comprehensive legislation to address the Statewide solid waste facility debt issue. S1056 establishes a legislative framework for a deregulated solid waste industry and provides for the payment of debt obligations issued by public authorities to provide for the facilities required by the invalidated State solid waste program. Neither piece of legislation has been enacted.
[6] The LFB further reduced the EIC from $31 per ton to $28.64 per ton.
[7] We note that the statute governing municipal parking authorities was amended in 1958 to specifically authorize a municipality to guarantee the debt of its parking authority. L. 1958, c. 22, §§ 5 and 9.