753 A.2d 661 (2000)
164 N.J. 270
In the Matter of PASSAIC COUNTY UTILITIES AUTHORITY PETITION REQUESTING DETERMINATION OF FINANCIAL DIFFICULTY AND APPLICATION FOR REFINANCING APPROVAL.
City of Paterson and Martin G. Barnes, Plaintiffs-Appellants,
v.
Passaic County Board of Chosen Freeholders and Passaic County Utilities Authority, Defendants-Respondents, and
Township of Wayne, Borough of Totowa, Borough of West Paterson, City of Clifton, Borough of Wananque, Borough of Bloomingdale, Borough of Hawthorne, Borough of Ringwood, Borough of Pompton Lakes, and Township of West Milford, Intervenors-Respondents (Two Cases).
Supreme Court of New Jersey.
Argued February 2, 2000.
Decided June 22, 2000.
*662 Sandra T. Ayres, Montclair, for plaintiffs-appellants (Schwartz, Tobia, Stanziale, Rosensweig & Sedita, attorneys).
Benjamin Clarke, Teaneck, for defendant-respondent Passaic County Utilities Authority (DeCotiis, Fitzpatrick & Gluck, attorneys; Michael R. Cole, of counsel).
Joseph J. Maraziti, Jr., Short Hills, for defendant-respondent Passaic County Board of Chosen Freeholders (Maraziti, Falcon & Healey, attorneys; Leah C. Healey, of counsel; Brent T. Carney, on brief).
John Fiorello, Wayne, Wayne Township Attorney, for intervenors-respondents.
Daniel P. Reynolds, Deputy Attorney General, for respondent Local Finance Board (John J. Farmer, Jr., Attorney General of New Jersey, attorney; Nancy Kaplen, Assistant Attorney General, of counsel; Mr. Reynolds and Leslie D. Rosenthal, Deputy Attorney General, on the brief).
Michael A. Lampert, Princeton, submitted a brief on behalf of amici curiae National Solid Waste Management Association, Waste Management Association of New Jersey, BFI Waste Systems of New Jersey, Inc., Super Kwik, Inc., USA Waste *663 of New Jersey, Inc. and Waste Management of New Jersey, Inc. (Saul, Ewing, Remick & Saul, attorneys; Mr. Lampert, Alan V. Klein and Jane Kozinski, on the brief).
The opinion of the Court was delivered by STEIN, J.
This appeal fairly may be regarded as but the tip of an iceberg. It purports to present for resolution what is primarily a straightforward issue of statutory interpretation: whether section 22.1 of the Municipal and County Utilities Authorities Law, N.J.S.A. 40:14B-1 to -78, authorizes the Passaic County Utilities Authority (PCUA) to impose on municipalities and commercial waste generators that no longer use its facilities an Environmental Investment Charge (EIC) over the next ten years to raise funds sufficient to pay principal and interest obligations on approximately $80 million of bonded debt. Stated more simply, the narrow issue is the validity of the EIC imposed by the PCUA. A collateral issue concerns the validity of the 1997 Refunding Bond Deficiency Agreement (1997 Deficiency Agreement) pursuant to which Passaic County agreed to guarantee the payment of approximately $28 million in unsecured revenue bonds issued by the PCUA in 1991 to finance an incinerator construction project that subsequently was abandoned.
Realistically, however, the issues before us cannot be circumscribed so narrowly. We are informed that to date four other counties have adopted and imposed EICs, and that litigation challenging the validity of EIC's imposed in three of those counties is now pending in various courts. As of January 1999, nine of the State's solid waste management districts had submitted proposed plan amendments to the Department of Environmental Protection (DEP) proposing the assessment of an EIC. Christine LaRocca, New Jersey's Solid Waste Flow Control Regulations Have Been Trashed: Are Environmental Investment Charges the Answer? 17 Pace Envtl. L.Rev. 123, 136 (1999).
Moreover, the federal court litigation that precipitated the perceived need for New Jersey counties to adopt and impose EICs illuminates the issue before us and provides its context. In 1997 the Third Circuit Court of Appeals in Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 112 F.3d 652 (1997), amended by 135 F.3d 891 (3d Cir.1998), cert. denied sub nom. Essex County Utilities Authority v. Atlantic Coast Demolition & Recycling, Inc., 522 U.S. 966, 118 S.Ct. 412, 139 L.Ed.2d 316 (1997)(Atlantic Coast II), held that New Jersey's comprehensive statutory and regulatory controls over the disposal of state-generated solid waste discriminated against out-of-state solid waste facilities and thereby violated the Commerce Clause of the United States Constitution. As the Third Circuit noted, in reliance on the regulatory scheme invalidated by Atlantic Coast II New Jersey counties and utilities authorities had incurred substantial debt to plan and construct waste disposal facilities designed to process a statutorily-guaranteed solid waste flow. That public debt as of December 31, 1994 aggregated approximately $1.65 billion dollars, a result of fifty-three separate bond issues by New Jersey counties and local authorities. Atlantic Coast II, supra, 112 F.3d at 658. The unanticipated invalidation of the State's solid waste regulatory scheme permitted waste generators to bypass the facilities operated by counties and local authorities in favor of cheaper out-of-state disposal facilities. The result was that the counties and authorities experienced a drastic reduction in revenue, threatening the default of millions of dollars in outstanding public debt. The authorization and imposition by the PCUA and other authorities of EICs on municipalities and solid waste generators that formerly used their facilities was a direct consequence of the unprecedented dismantling *664 by the federal courts of New Jersey's solid waste regulatory system.
Informed by those events, we address the issues presented by this appeal. We conclude that the EIC imposed by the PCUA is not statutorily authorized because the statute neither expressly nor impliedly contemplates imposition of such unprecedented charges on non-users of the authority's facilities to liquidate debt previously incurred in reliance on a regulatory system declared unconstitutional by the federal courts. Because Passaic County entered into the 1997 Deficiency Agreement in express reliance on the validity of the EIC, we also invalidate that agreement.

I

A
The conduct and chronology of the federal court litigation invalidating New Jersey's solid waste regulatory system is highly pertinent to the issues before us. An appropriate starting point is a brief description of the challenged regulatory scheme, which we borrow from the Third Circuit's succinct summary:
In response to a waste disposal crisis, New Jersey enacted the Solid Waste Management Act ("SWMA"), N.J.S.A. §§ 13:1E-1 et seq., and the Solid Waste Utility Control Act ("SWUCA"), N.J.S.A. §§ 48:13A-1 et seq. in 1970 to provide a safe, comprehensive and effective means of solid waste disposal within the state. These statutes strictly control the collection, transportation and processing of solid waste generated within the state, thus earning the appellation "flow control laws." Under these laws, any waste disposal facility, regardless of its ownership or location, must clear two substantial hurdles before it disposes of solid waste generated within New Jersey. First, the facility must obtain a contract with one of New Jersey's twenty-two waste management districts. Unless a facility has been designated by a waste management district, that facility cannot dispose of locally generated waste. Second, even if the facility contracts with a district for service, the waste disposal facility must obtain the approval of the State's Department of Environmental Protection (hereinafter "the State" or NJDEP). Under this regime, out-of-state facilities have rarely been authorized to dispose of New Jersey's solid waste.
Under SWMA, New Jersey is divided into twenty-two solid waste management districts, which include the State's twenty-one counties and the Hackensack-Meadowlands District. N.J.S.A. § 13:1E-19. The districts have formulated long-term solid waste disposal plans in accordance with the State's laws and regulations. N.J.S.A. § 13:1E-20. These plans have had to meet NJDEP's approval. See N.J.S.A. § 13:1E-24. Management districts have chosen between delegating their waste disposal responsibilities to designated municipal authorities within the district or exercising direct control over waste disposal themselves. Municipal authorities and districts in turn have met the State's waste disposal obligations by contracting with or operating their own waste disposal and recycling facilities.
Pursuant to the flow control laws, several waste disposal authorities have assumed substantial debt obligations to build waste disposal facilities "to assure the safe and efficient disposal of solid waste generated in their districts." Atlantic Coast II, 931 F.Supp. at 347 ¶ 5. The district court found that "[t]he solid waste public debt outstanding in New Jersey as of December 31, 1994, was $1.65 billion, which is the total of 53 separate bonds issued by New Jersey local authorities or counties." Id., at 348 ¶ 12. Currently, the disposal facilities service their debt by charging "tipping fees" for disposing of waste. The fees charged by the designated facilities are significantly higher than the fees *665 charged by their out-of-state counterparts. Id., at 349 ¶ 17.
Once an authority has chosen a particular private or public entity to service its waste disposal needs, that entity must seek approval from NJDEP (through registration and issuance of a permit) prior to commencing service. N.J.S.A. § 13:1E-5. A facility cannot obtain a permit unless it is designated by the municipal district or authority in its waste disposal plan. N.J.S.A. § 13:1E-4(b). Regional Recycling, Inc. v. State Dep't of Environmental Protection, 256 N.J.Super. 94, 606 A.2d 817 (App.Div.1991). All waste generated within the state must be directed to the processing facility designated by the district or municipal authority. See N.J.S.A. § 48:13A-4(c). The designation of the particular facility for waste disposal in each waste management district is codified in NJDEP regulations. N.J. Admin. Code tit. 7, § 7:26-6.5 (Supp.1996).
Although a waste management district or authority may contract with an out-of-state facility for waste disposal, NJDEP's policy of attaining self-sufficiency has favored operators that have facilities within the state or that are willing to construct a facility there. See Atlantic Coast I, 48 F.3d at 707-708. Waste management districts desiring to enter into agreements with out-of-state facilities have had to certify to NJDEP that no other sites within the district meet the district's waste disposal needs. N.J.S.A. § 13:1E-21(b)(3). The certification provision on its face does not appear to prohibit out-of-state solid waste facility operators from competing for an agreement to process a district's waste. Nevertheless, the certified processors for each district, presently listed in N.J.A.C. § 7:26-6.5, have been chosen under the NJDEP policy of reducing dependence on facilities outside the state for waste disposal services. See Atlantic Coast I, 48 F.3d at 707 (discussing NJDEP's self-sufficiency policy). As the district court stated at the first Atlantic Coast trial: "Although it is not the subject of a clear legislative direction [sic], it is equally clear that [NJDEP] administers the law with the specific goal that all waste generated in New Jersey be disposed of within the borders of the state." Atlantic Coast I, 48 F.3d at 707 (quoting district court) ( [sic] in original). The imposition of this self-sufficiency policy on the selection of waste disposal facilities has resulted in the discrimination against out-of-state processors which we found in Atlantic Coast I.

Under the present flow control system, those who violate New Jersey law by disposing of solid waste at facilities not designated in N.J.A.C. § 7:26-6.5 risk the imposition of significant penalties. Section 13:1E-9 of the SWMA authorizes NJDEP's commissioner to take various civil and administrative actions against those who violate any provision of P.L.1970, c. 39 (the SWMA), or any code, rule or regulation adopted pursuant to that law. In addition, Section 13:1E-9(e) authorizes civil penalties totaling as much as $50,000 for each violation of the solid waste laws "provided that each day during which the violation continues shall constitute an additional, separate and distinct offense." N.J.S.A. § 13:1E-9(e). The State has employed this provision to penalize undesignated waste disposal facilities and enjoin them from engaging in the unauthorized collection and disposal of solid waste generated within the state. See e.g. State, Dep't of Environmental Protection v. Interstate Recycling, Inc., 267 N.J.Super. 574, 632 A.2d 526 (App.Div.1993) (NJDEP may pursue injunction against unlicensed waste disposal facility).
Other provisions enforcing the requirement that waste disposal facilities be designated under N.J.A.C. § 7:26-6.5 include Section 13:1E-9.4 of SWMA, which authorizes civil forfeiture of all conveyances used or intended for use in *666 the transport or unlawful disposal of solid waste. N.J.S.A. § 13:1E-9.4(d). In addition, persons who collect, dispose of or transport solid waste to undesignated sites subject themselves individually to civil fines of up to $10,000 for each day of violation. N.J.S.A. § 13:1E-9.4. Finally, an individual who engages in the unauthorized collection, transport or disposal of solid waste is guilty of a crime in the fourth degree, which carries with it the penalty of up to 18 months in prison. N.J.S.A. § 48:13A-12(a).
Taken as a whole, the waste disposal laws present substantial barriers to out-of-state firms wishing to collect, transport and process any of the waste generated within New Jersey. The State is able to enforce this regulatory system through its impressive array of rules, regulations, fines and other penalties.

[Id. at 657-59 (footnotes omitted).]
Following the United States Supreme Court's decision in C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), in which the Court invalidated as violative of the dormant Commerce Clause a local waste flow control ordinance of the Town of Clarkstown, New York, the Third Circuit concluded that New Jersey's waste-flow control statutes and regulations discriminated against interstate commerce by obstructing the shipment of solid waste from New Jersey and disfavoring the disposal of such waste at out-of-state facilities. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 48 F.3d 701, 712-13 (1995) (Atlantic Coast I). The Court of Appeals then remanded the matter to the district court to ascertain whether New Jersey could satisfy the Commerce Clause's heightened scrutiny standard by demonstrating that it did not possess alternative means of achieving a safe and effective solid waste disposal system. Id. at 718.
Concluding that New Jersey had not satisfied that demanding burden of proof, the district court found New Jersey's waste control laws unconstitutional and enjoined the enforcement of those laws, but stayed its injunction for two years except with respect to processors of construction and demolition waste. Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 931 F.Supp. 341, 359 (D.N.J.1996). Responding to the State's contention before it that no alternative waste disposal regulatory scheme adequately could protect the fiscal integrity of the public entities that had issued bonds in reliance on the existing system of regulation, the district court observed:
The above-market tipping fees that constitute the heart of New Jersey's flow control system are more or less a hidden tax paid by New Jersey residents. The tipping fees are used to cover not only the debt service of the bonds issued to fund facilities under flow control, but also to cover the fixed costs of operating waste disposal facilities, financing recycling programs and other environmentally friendly recovery projects, and developing long-term disposal plans. Those activities could be financed through up-front taxes, user fees or other charges which do not discriminate against interstate commerce. Even if there are significant costs to implementing the necessary revisions to the current flow control system, nothing in the record suggests that these would be exorbitant or beyond the capabilities of reasonable fundraising alternatives. And, in any case, the threat of some increase in costs cannot negate the constitutional mandate of the dormant Commerce Clause.

[Id. at 353-54.]
On appeal to the Third Circuit, the DEP disputed the district court's conclusion that plausible alternative methods of financing were available to the State. Addressing the plaintiffs' contention that pursuant to *667 N.J.S.A. 40A:5A-19 the State's Local Finance Board (LFB) would be obligated to order adoption of a financial recovery plan if an authority were in fiscal difficulty, the DEP asserted in its brief that that statute "does not itself provide the solution but only the procedural mechanism for addressing the problem. In fact, it has hardly ever been triggered since the Great Depression ... and its use on the scale and magnitude at stake herein is unprecedented and unproven." Responding to the contention that the counties could assume the authorities' outstanding debt, the DEP argued that
[a] number of counties would be drastically affected by any obligation to refund the local solid waste authority debt because the size of that obligation in relation to their current total outstanding debt would bring them close to or over the debt limit, making it virtually impossible for them to raise capital for other essential services.
Moreover, the DEP observed that county tax revenue increases would be an unsatisfactory source of funding because "the current bonds are not formally secured by that type of revenue stream and because reliance on property taxes is an inherently inequitable mechanism for a use-based service." Similarly, the DEP rejected the assertion that the authorities' debt could be serviced out of county or state general revenues on a year-to-year basis, noting that "[that] revenue source cannot be assured from year to year and from legislature to legislature."
Finally, the DEP contended that the district court "overlooked" significant legal and factual impediments to the imposition of a "systems benefit surcharge" (such as an EIC), expressly questioning both the legality and constitutionality of such a surcharge:
One of the unanswered legal questions is whether such a subsidy of revenues from non-users of the system is authorized under the current rate covenants or the statutes governing these county authorities.
See, e.g., N.J.S.A. 40:14B-22.1.
Another serious and unresolved "cloud" hanging over this financing alternative is the question whether the industry parties will successfully challenge this solution as equally unconstitutionala position they steadfastly refused to reveal.

[Emphasis added.]
Thus, the DEP in its briefs to the Third Circuit in Atlantic Coast II expressed doubt about the legality and constitutionality of an EIC. We note that the Third Circuit's partial response to DEP's arguments concerning the illegality of user charges was to observe that "the legality of the proposed alternative under state law is irrelevant to a court's heightened scrutiny inquiry because the legislature can re-write its statutes if it has the desire or the need to do so." Atlantic Coast II, supra, 112 F.3d at 667 (second emphasis added).
Consistent with the Third Circuit's observation, and apparently in anticipation of the final judgment in Atlantic Coast II, Assembly Bill No. 50 (A-50) was introduced in the New Jersey Assembly in late 1996 to address the problem of the county authorities' outstanding debt. A-50, as amended, authorized the imposition of an Environmental Investment Charge. The bill was voted out of the Assembly Agriculture and Waste Management Committee in mid-1997. The Committee Statement impliedly acknowledged the need to
revise the solid waste management statutes and provide a mechanism for the recovery of the environmental investment costs incurred by public authorities and counties ... The bill authorizes every public authority and county to establish and implement a system to calculate, charge and collect environmental investment charges (EIC's) as may be necessary to recover the environmental investment costs incurred by the public authority or county.

*668 [Assembly Agriculture and Waste Management Committee Statement to A-50, June 12, 1997.]
A-50 was not posted for vote in the Assembly and was not enacted into law.
In August 1997, approximately three months after the Third Circuit's decision in Atlantic Coast II, the DEP issued a report entitled "Guidance Document In Response to the May 1, 1997 Court Decision on Solid Waste Flow Control." That document addressed a wide range of issues relating to solid waste regulation and disposal, and included the following series of questions and answers in a section of the document entitled "EIC Questions."
Question: What is the legal authority to impose an EIC?
Answer: The legal authority to impose an EIC derives from each authority's enabling statutes. See, N.J.S.A. 40:14B-1 et seq. (Municipal and County Utilities Authorit[ies] Law); N.J.S.A. 40:37A-1 et seq. (County Improvement Authorit[ies] Law). In addition, the Local Finance Board has broad authority to order the imposition of fees and/or charges necessary for local government entities in financial difficulty to assure satisfaction of outstanding obligations (N.J.S.A. 40A:5A-18 & 19), and the DEP has broad authority over solid waste utility rates to ensure adequate and proper service, N.J.S.A. 48:13A-1 et seq.

Question: Will the EIC charge be approved by the DEP or the Local Finance Board or both agencies?
Answer: The EIC will be reviewed by the DEP to assure that it is consistent with the local government entity's obligation to assess just and reasonable charges. The Local Finance Board will review the EIC to ensure that it is sufficient for the local government entity to meet its financial obligations. A single county plan amendment can be prepared for submission to DEP for its review.
Question: What eligible charges may be contained within an EIC?
Answer: The most certain component of an EIC is debt service. Other potentially acceptable components of an EIC charge include host community benefits, state taxes (Solid Waste Services Tax and Landfill Closure and Contingency Fund Taxes), system-wide rate components, and standby operating costs (minimal operating costs required to keep a facility open).
As noted by the Appellate Division opinion, In re Passaic County Utilities Authority Petition, 321 N.J.Super. 186, 195, 728 A.2d 323 (1999), the DEP adopted emergency regulations in September 1997 pursuant to which solid waste management districts were urged to amend their plans and set forth "[t]he method of financing solid waste management in the district, including any mechanism to be instituted by the district for ensuring the payment of outstanding debt and other financial obligations." N.J.A.C. 7:26-6.10(b)(6). In its published comments the DEP stated that imposition of an EIC would constitute an acceptable funding mechanism to deal with outstanding debt. 29 N.J.R. 5084, 5087 (Dec. 1, 1997).

B

The PCUA's EIC
In November 1997 the PCUA, pursuant to section 6 of the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-1 to -27, applied to the Local Finance Board of the Department of Community Affairs for approval of a refinancing proposal involving the issuance of refunding bonds in an amount not to exceed $40,165,000, the use of part of the proceeds of the refunding bonds to retire $21.4 million of the approximately $27 million balance of a 1991 revenue bond issue, the imposition of an EIC for ten years on all prior users of the PCUA's waste disposal facilities in an amount sufficient to pay the debt service on all of the PCUA's outstanding debt (including the proposed refunding bond issue), and execution of the 1997 Deficiency *669 Agreement with Passaic County pursuant to which, in return for solid waste services, the County agreed to pay to PCUA any amounts necessary to enable PCUA to pay the debt service on its outstanding obligations if its revenues are inadequate. In executing the 1997 Deficiency Agreement, the County anticipated, consistent with the PCUA's representations to the LFB, that the PCUA's revenues from the EIC would be sufficient to maintain all debt service payments.
When the PCUA submitted its application to the LFB, its outstanding indebtedness was approximately $76.9 million, almost all of which was attributable either to costs incurred in connection with land acquisition and planning for construction of an incinerator, a project ultimately abandoned by the PCUA, or to cost incurred in connection with the purchase of waste disposal rights in Pennsylvania landfills. The PCUA's outstanding debt as of December 1, 1997 consisted of the following items:

PASSAIC COUNTY UTILITIES AUTHORITY
DEBT OUTSTANDING DECEMBER 1, 1997
Project Notes
 Solid Waste System Taxable Project
 Notes, Series, 1997, Due August 4,
 1998, 5.95% $ 2,546,000
 Solid Waste System Taxable Project
 Notes, Series 1997A, Due August 4,
 1998, 5.95% 2,500,000
 Solid Waste System Tax Exempt
 Project Notes, Series 1997B Due
 August 4, 1998, 3.90% 6,400,000
 ____________
 $ 11,446,000
 ------------
Landfill Bonds and Notes
 Solid Waste System Project Notes,
 Series 1996 Due March 1, 1999,
 5.00% (Accreted Value at Maturity
 $3,725,000) (Includes Accretion of
 $263,673 at E.O.P.) 3,502,263
 Solid Waste Disposal Revenue
 Bonds; Refunding Series 1997
 Landfill Bonds Payable 5.00-5.42%
 (Accreted Value at Maturity $31,535,000)
 (Includes Accretion of
 $1,837,975 at E.O.P.) 25,428,216
 Solid Waste (Landfill) Revenue
 Bond, Refunding Series 1992A Due
 March 1, 1998, 5.70% 8,690,000
 __________
 37,620,470
 ----------
Resource Recovery Bonds
 Solid Waste System Revenue Bonds
 1991 Series Revenue Serial Bonds
 Payable 6.25% 2,035,000
 Term Bonds Payable 7.00% 25,870,000
 __________
 27,905,000
 ----------
 TOTAL $ 76,971,479

PCUA's application to the LFB revealed that the $27.9 million outstanding in 1991 Series Solid Waste Systems Revenue Bonds, issued to finance costs incurred for the Authority's aborted incinerator project, were secured only by PCUA tipping fees, which accounted for their Baa-1 Moody's Investor service rating and relatively high interest rates. The Refunding Series 1996 and 1992A Revenue Bonds, which accounted for approximately $34 million of the PCUA's outstanding debt, had been issued to finance the refunding of the outstanding balance of the PCUA's 1987 Landfill Bonds issued to finance the acquisition of certain easement and license rights for the disposal of solid waste at out-of-state landfills. The 1987 Landfill Bonds, as well as the 1992 and 1996 Refunding Bonds issued to retire the balance of the 1987 bond issue, were secured by a 1987 County Deficiency Agreement pursuant to which the County agreed to pay the PCUA such amounts as the PCUA may require to maintain debt service payments on those bond issues.
The PCUA's remaining indebtedness included three series of Project Notes issued in 1997 aggregating approximately $11.4 million. Approximately $2.5 million of those notes were issued in connection with the financing of a settlement with an owner of property condemned for the abandoned incinerator project; another $2.5 million in notes were issued in connection with the settlement of litigation relating to a Passaic County transfer station; and the balance of $6.4 million in Notes were issued in connection with a contract to acquire disposal rights at the Empire landfill in Pennsylvania. The final item of outstanding debt was $3.5 million in Series 1996 Project Notes, but PCUA's application to the LFB did not disclose the reason for their issuance.
A critical component of the PCUA's LFB submission, for which the LFB's approval *670 was sought, was the 1997 Deficiency Agreement pursuant to which Passaic County would agree to pay the PCUA any amounts required to meet its debt service obligations on the proposed 1997 Refunding Bonds. Because those Refunding Bonds were intended to refinance $21.4 million of the unsecured Series 1991 Revenue Bonds, the holders of those Bonds would benefit substantially by obtaining the added security provided by the County's guarantee. Pursuant to a December 1997 amendment to the Deficiency Agreement Passaic County also agreed to guarantee payment of the debt service on the approximately $6.5 million of the 1991 Series Revenue Bonds not originally to be refinanced by the 1997 Refunding Bonds, but which pursuant to the PCUA's amended application would be refunded by the 1997 bond issue.
Concurrently with the submission of its application to the LFB, the PCUA retracted and renewed a previously filed petition with the LFB, pursuant to N.J.S.A. 40A:5A-18 and -19, seeking a determination of financial difficulty and ordering implementation of the proposed EIC to alleviate that difficulty. In support of its submissions to the LFB, the PCUA asserted that the changes in waste flow rules required by the Third Circuit's decision in Atlantic Coast II "have resulted in significant tonnage losses through the Authority's system which have resulted in revenue shortfalls that place in jeopardy the Authority's ability to pay these bonds."
Although we need not and do not address in this opinion plaintiff City of Paterson's (Paterson) objections to the lack of process afforded it by the LFB, we note with concern Paterson's allegations. Despite its obvious financial interest that we elaborate on subsequently, infra at 286-88, 753 A.2d at 670-71, Paterson asserts that it received no notice of the PCUA's financing application and petition to the LFB, was afforded less than twenty-four hours to review the pertinent documents, was allotted five minutes to speak at the LFB hearing, and was afforded three working days to prepare and submit written comments. If proved, those allegations significantly would diminish the reliability of the proceedings before the LFB.
On December 6, 1997 the LFB adopted resolutions pursuant to sections 6 and 19 of the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-6 and -19, respectively approving the PCUA's proposed refunding bond issue and ordering implementation of its proposed financial plan, which included imposition and collection of an EIC. The LFB's authority to authorize imposition of an EIC is an issue sharply contested by the parties.

C
In January 1988 Paterson and Martin G. Barnes, a Paterson resident and taxpayer, filed two actions in lieu of prerogative writ against Passaic County and the PCUA in the Law Division. The first action primarily sought a declaration that the 1997 Deficiency Agreement between the County and the PCUA was invalid and unenforceable, and sought an injunction restraining its enforcement. That suit also challenged the validity of the EIC imposed on Paterson by the PCUA. The second suit primarily challenged the validity of Passaic County's adoption of an amendment to its District Solid Waste Management Plan, including the PCUA's issuance of refunding bonds and imposition of the EIC authorized by the LFB. In that same month plaintiffs filed in the Appellate Division a Notice of Appeal from the LFB's orders, and subsequently filed an amended Notice of Appeal challenging the LFB's grant of the PCUA's supplemental application to increase the amount of refunding bonds issuable by $6.5 million to enable Passaic County to guarantee the balance of the heretofore unsecured 1991 revenue bonds.
Early in 1998 the PCUA gave Paterson formal notice of its EIC obligation. EIC assessments on municipalities were based *671 on the volume of municipal waste collected for disposal in 1996, and assessments to commercial generators were based on average commercial flows between 1993 and 1996. Paterson's 1998 EIC rate was $29.64 per ton and its 1998 assessment was $2,500,122, payable quarterly. Paterson's aggregate EIC obligation over ten years is in excess of $20 million, of which it estimates that approximately $7.5 million would be allocated to payment of debt service on that portion of the 1997 refunding bonds that refunded the heretofore unsecured 1991 revenue bonds. On receipt of its EIC bill, plaintiffs amended their complaint to assert a direct challenge to the PCUA's authority to assess an EIC against Paterson.
To provide a frame of reference against which to compare the EIC assessed against Paterson, the record informs us that prior to the Third Circuit's decision in Atlantic Coast II, the PCUA charged Paterson $103 per ton for waste removal, a fee that included all of the PCUA's costs for operating and administrative expenses, as well as debt service. After the Atlantic Coast II decision, the PCUA offered to Paterson and other prior users of its system waste-disposal services for processible waste at a rate of $47.75 per ton, a rate the PCUA asserts is less than the rate Paterson presently pays. Paterson asserts that neither it nor any other Passaic County municipalities are disposing of waste through the PCUA, and that its current costs are $75,000 less per month than the price offered by the PCUA. In any event, the EIC charge of $29.64 per ton, for which Paterson receives no current PCUA services, is about two-thirds of the cost per ton Paterson would have to pay the PCUA to dispose of its solid waste.
The Law Division judge consolidated the prerogative writ actions and transferred the consolidated action to the Appellate Division. Plaintiffs filed a Notice of Appeal of that transfer order. (Although petitioners continue to challenge the correctness of that transfer order, we need not and do not address that issue.) The Appellate Division consolidated plaintiffs' appeal of the transfer order with their appeal of the LFB orders, and subsequently consolidated those appeals with the prerogative writ actions that had been transferred by the Law Division.
The Law Division also granted a motion to intervene in the consolidated prerogative writ actions filed on behalf of ten Passaic County municipalities. The brief filed on behalf of those municipalities supported the validity of the EIC, contending that Paterson's opposition to the EIC reflected a preference that the PCUA's stranded debt be paid through the imposition of property taxes rather than through user fees calculated on the basis of the 1996 waste generation. For example, the intervenors noted that the Township of Wayne contributes approximately twenty-six percent of the county's property tax revenue, but generated only 5.24% of the County's 1996 solid waste flow. The intervenors asserted that if the EIC were invalidated, Wayne's 1998 share of the PCUA's stranded debt would increase from approximately $575,000 to over $3.8 million. Similarly, invalidation of the EIC would increase Clifton's 1998 share of the PCUA's stranded debt from approximately $900,000 to over $3.7 million. We note that Paterson's opposition to the EIC in part reflects its preference that the portion of the PCUA's stranded debt validly guaranteed by Passaic County be paid out of county general revenues rather than an EIC, with the result that Paterson's share, because of its relatively low property valuations, would be reduced from over thirty percent of the aggregate debt to approximately eleven percent.

D
Before addressing the legal issues presented by this appeal, we take note of other pending litigation that involves substantially similar issues.
1. Township of Galloway v. Atlantic County Utilities Authority (A-1083-98T5) *672 and National Solid Wastes Management Association v. Atlantic County Utilities Authority (A-1126-98T5)
These consolidated appeals, argued in the Appellate Division in February 2000, and awaiting decision, were transferred by the Chancery Division to the Appellate Division in September 1998. In the first action, plaintiffs were two Atlantic County municipalities, a waste hauler, and three Galloway Township residents. Plaintiffs in the second action were two solid waste hauler associations and four waste haulers collecting waste in Atlantic County. Both suits challenged the authority of the Atlantic County Utilities Authority (ACUA) to impose an EIC on municipalities and waste haulers to supplement the ACUA's tipping-fee revenues and enable it to pay debt service obligations on approximately $87 million of revenue bonds issued to fund the costs of a transfer station, expansion of the ACUA's landfill, and the Authority's obligations under its waste-disposal contract with a Pennsylvania landfill owner. In ruling on plaintiffs' application for injunctive relief, the Chancery Division reached the preliminary conclusion that the EIC "does not appear to be authorized by statute," but that court later determined that it was without jurisdiction to decide the matter.
2. IMO Certain Amendments to the Adopted and Approved Solid Waste Management Plan (A-5964-97T3)
This appeal, now pending in the Appellate Division with its disposition stayed pending our resolution of the matter before us, originated as a suit filed by two associations of solid waste haulers and three solid waste collection companies challenging the DEP's decision to approve an amendment to the Union County District Solid Waste Management Plan (Plan Amendment). The Plan Amendment proposed a substantial reduction in the outstanding bonded indebtedness of the Union County Utilities Authority (UCUA) consisting of approximately $294 million, incurred to finance acquisition and construction costs associated with a resource-recovery facility and other ancillary solid-waste disposal facilities, as well as for recycling and landfill costs. The debt reduction was achieved in part by using funds on hand to reduce part of the debt, by refinancing and extending the debt's maturity, and by leasing the resource-recovery facility to its private operator in return for lease payments totaling $180 million. That lease agreement was facilitated by long-term waste delivery contracts with thirteen Union County municipalities guaranteeing substantial annual flow of waste to the resource-recovery facility. The balance of the UCUA's debt is to be funded by an EIC imposed on non-users of the UCUA's facilities, specifically haulers that pick up waste generated in Union County and dispose of the waste elsewhere. Appellants contend that the UCUA's EIC is unauthorized by statute and that it violates the Commerce Clause in view of the principles established by the United States Supreme Court in C & A Carbone, Inc. v. Town of Clarkstown, supra, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399.
3. National Solid Waste Management Association v. Gloucester County Improvement Authority (A-1041-98T3)

This action, instituted by two solid waste management associations and four solid waste haulers, challenges the imposition of an EIC by the Gloucester County Improvement Authority (GCIA) that is assessed against solid waste haulers not using the facilities of the GCIA to dispose of solid waste generated in Gloucester County. Approval to impose an EIC was sought by the GCIA because of a shortfall of revenue to pay debt service on approximately $28 million of outstanding bonded indebtedness issued to finance the landfill operated by the GCIA. Analogous to the legal issue in the appeal before us that requires an interpretation of section 22.1 of the Municipal and County Utilities Authorities Law, the validity of the EIC imposed by the GCIA is to be determined by the provisions of the County Improvement *673 Authorities Law, N.J.S.A. 40:37A-44 to -135, under which it is organized. After the Appellate Division remanded the matter to the Law Division to develop a factual record, appellants filed a Petition for Certification with this Court seeking review of the Appellate Division's disposition. That Petition remains pending.

II
The parties agree that the validity of the PCUA's EIC depends on the Court's interpretation of N.J.S.A. 40:14B-22.1, a provision of the "municipal and county utilities authorities law," N.J.S.A. 40:14B-1 to -78 (MCUAL or the Law), which reads as follows:
40:14B-22.1. Solid waste service charges
Every municipal authority is hereby authorized to charge and collect rents, rates, fees or other charges (in this act sometimes referred to as "solid waste service charges") for the use or services of the solid waste system. Such solid waste service charges may be charged to and collected from any municipality or any person contracting for such use or services or from the owner or occupant, or both of them, of any real property from or on which originates or has originated any solid waste to be treated by the solid waste system of the authority, and the owner of any such real property shall be liable for and shall pay such solid waste service charges to the municipal authority at the time when and place where such solid waste service charges are due and payable. Such rents, rates, fees and charges, being in the nature of use or service charges, shall as nearly as the authority shall deem practicable and equitable be uniform throughout the county for the same type, class and amount of use or service of the solid waste system, except as permitted by section 1 of P.L.1992, c. 215 (C. 40:14B-22.2), and may be based or computed on any factors determining the type, class and amount of use or service of the solid waste system, and may give weight to the characteristics of the solid waste and any other special matter affecting the cost of treatment and disposal of the same.
Before addressing that issue of statutory interpretation, we shall review some of the background and relevant chronology of the material provisions of the MCUAL to provide a foundation for resolving the interpretative issue before us.
As originally enacted in 1957, the MCUAL authorized counties, or municipalities acting separately or with other municipalities, "through the agency of a municipal authority," to "acquire, construct, maintain, operate or improve works for the accumulation, supply or distribution of water and works for the collection, treatment, purification or disposal of sewage or other wastes." L. 1957, c. 183, § 2(1). In short, the MCUAL's original purpose was to authorize the establishment and operation of county and municipal authorities to deal only with water supply and distribution, and sewerage collection and disposal. The design of the statute was to impose the cost of the water or sewer services, to be provided by an authority established under the statute, on residential or commercial users of those services, including counties or municipalities contracting for such services. The original statute stated that the purpose and object of the MCUAL included:
(5) In general, granting to counties and municipalities and to such municipal authorities discretionary powers to provide for utility services designed to provide or distribute such a supply of water or to relieve pollution of such waters in or bordering the State at the expense of the users of such services or of counties or municipalities or other persons contracting for or with respect to the same.

[Id. at § 2(5)(emphasis added).]
Significantly, the provisions of the "Local Improvements" law, N.J.S.A. 40:56-1 to -89, pursuant to which municipalities *674 are authorized to construct local improvements, including sewer lines and water mains, and assess the cost thereof immediately on the properties benefitted, N.J.S.A. 40:56-1, -21, which assessments constituted first liens on the property assessed, N.J.S.A. 40:56-33, were inapplicable to sewer and water systems constructed pursuant to the MCUAL as the statute originally was enacted. (Similarly, the provisions of the Local Improvements law were inapplicable to sewer and water systems constructed pursuant to the sewerage authorities law, L. 1946, c. 138, N.J.S.A. 40:14A-1 to -45(SAL), the material provisions of which are analogous to those of the MCUAL.) See Darrah v. Township of Evesham, 111 N.J.Super. 62, 66-67, 267 A.2d 70 (App.Div.1970). Accordingly, an important interpretative issue that arose under those laws concerned the power of authorities that construct sewer or water systems under those statutes to recover their capital expenditures absent the power to impose an assessment for benefits.
This Court addressed that issue under the SAL in Airwick Industries, Inc. v. Carlstadt Sewerage Authority, 57 N.J. 107, 122, 270 A.2d 18 (1970)[1], and subsequently in White Birch Realty Corporation v. Gloucester Township Municipal Utilities Authority, 80 N.J. 165, 176, 402 A.2d 927 (1979), we applied our holding in Airwick to authorities created under the MCUAL. In Airwick, the Carlstadt Sewerage Authority constructed a sewerage collection system to service approximately 650 acres in the eastern section of the Borough, financing the construction with the proceeds of a $5.8 million bond issue. In addition to annual user charges imposed only on users of the system, the Authority imposed a graduated schedule of connection fees for new users of the system, as follows:
$1,500 for users connecting within one year of availability;
$3,000 for users connecting within two years; $4,500 for users connecting within three years;
$5,000 for users connecting after three years of availability.
A group of commercial users contested the validity of their sewer bills, including the graduated connection fees. Id. at 111-12, 270 A.2d 18.
Without sustaining the specific incremental connection fee schedule imposed by the Carlstadt Sewer Authority, this Court recognized the principle that owners of unimproved properties that elect to defer connection to a sewer system until their properties can make use of the system should in fairness be required, upon connection, to contribute a fair share of the debt service costs incurred to construct the system. Id. at 120-22, 270 A.2d 18. The Court noted that the SAL (like the MCUAL) "does not authorize a special assessment or any immediate charge against a non-user." Id. at 121, 270 A.2d 18. However, the Court determined that the statutory authorization of a sewer connection charge, see N.J.S.A. 40:14A-8, constituted the appropriate mechanism for recovering from properties who defer connection to an available sewer system a fair portion of the cost of construction. The Court stated:
The logical construction of the foregoing subsections is that the legislature intended that the installation and construction costs, i.e., debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they assume a fair share of *675 the original construction costs when they become improved properties.
The Authority may, therefore, include as part of the connection fee a sum of money which will represent a fair contribution by the connecting party toward the debt service charges theretofore met by others. The statute need not be read to require precise mathematical equality, but rather to contemplate rough equality, keeping in mind that we are in an area in which, as with respect to other tax impositions, absolute equality is neither feasible nor constitutionally vital. The Authority may, therefore, in its discretion, prescribe a schedule of connection fees escalating with the passage of time, requiring a potential user to absorb a fair proportion of the sum theretofore paid by the actual users for principal and interest on the bonds.
[Airwick, supra, 57 N.J. at 122, 270 A.2d 18.]
More recently this Court endorsed the Airwick holding in Meglino v. Township Committee of the Township of Eagleswood, 103 N.J. 144, 510 A.2d 1134 (1986), noting with approval Airwick's reasoning that "those properties actually using the system should alone absorb the cost of operation and maintenance since the expenditure for such purposes arises solely for that use." Id. at 153, 510 A.2d 1134. We noted the Court's conclusion in Airwick that "[b]oth improved and unimproved property receive an immediate enhancement in value from the mere existence of the [sewer] system and the only equitable manner in which to distribute the original cost is for the two categories of properties to be fairly called upon to pay for the original construction cost." Id. at 154, 510 A.2d 1134 (citing Airwick, supra, 57 N.J. at 121, 270 A.2d 18). We also noted in Meglino the Airwick, holding that an "authority may therefore include as part of the connection fee a sum of money that will represent a fair contribution by the connecting party toward the debt service charges theretofore met by others," and that Airwick "sustained an escalating connecting fee to be charged to the unimproved properties in the sewer service area as they connected to the system." Ibid. Accordingly, we observed in Meglino that "the accounting principles of Airwick are sound and remain the fundamental premise by which we should approach municipal water or sewer utility accounting." Ibid.
The Airwick principles consistently have guided other courts in interpreting and applying the MCUAL. In Ivan v. Marlboro Township Municipal Utilities Authority, 162 N.J.Super. 466, 393 A.2d 598 (App.Div.1978), plaintiffs sued to restrain a township utilities authority from imposing a lien on their property for unpaid annual water charges. Plaintiffs, who had their own well, did not use the authority's water and had not connected their home to the authority's water system. The authority noted that the annual service charge entitled plaintiffs to 25,000 gallons of water, and contended that the MCUAL implicitly authorized it to impose a minimum charge on all properties benefitted by the availability of water facilities. The Appellate Division agreed with the trial court that "nonusers of the system cannot be compelled to pay a minimum fee based on operating costs and expenses as well as debt service without contracting for the use of the system." Id. at 468, 393 A.2d 598. The court noted a recent amendment to the MCUAL, L. 1977, c. 441, that, consistent with Airwick, authorizes authorities to impose a connection fee that includes the cost of physical connection to a water system plus a fair contribution for debt service charges on the bonds issued to finance its construction. See N.J.S.A. 40:14B-21. Nevertheless, the court noted that no connection fee had been imposed on plaintiffs. The court stated:
However, in our view, nonusers of the system cannot be compelled to pay a minimum service charge for costs of operation and management. No statutory provision expressly authorizes the imposition *676 of such charges upon non-users, and the sense of the law, as viewed in the analogous Airwick Industries case, speaks against this practice.
[Ivan, supra, 162 N.J.Super. at 469, 393 A.2d 598.]
The Airwick principles also were implicated in Hamilton Township Municipal Utilities Authority v. Apple Tree Corporation, 202 N.J.Super. 440, 495 A.2d 434 (App.Div.1985), in which the court addressed whether an authority organized under the MCUAL could impose, in addition to an annual service charge and a connection fee, a sewer reservation fee to cover the cost of thirty-six units that had been reserved for defendant. Although 224 sewer units originally had been reserved for defendant, when the sewer authority was compelled to reduce that number to 100 defendant lost its financing commitment and could develop only sixty-four units, leaving thirty-six sewer permits unused. Id. at 442, 495 A.2d 434. Defendant already had paid a connection fee for the thirty-six unused permits, and challenged the "reservation fee" as an unauthorized annual service charge on unimproved property. Ibid.
The Appellate Division invalidated the reservation fee, concluding that it was both unauthorized under the MCUAL and inconsistent with our holding in Airwick. Id. at 446, 495 A.2d 434. Concerning the statutory authority for the reservation fee, the court noted that the MCUAL permitted the imposition of only sewer service charges and connecting fees, N.J.S.A. 40:14B-22, noting that the combination of the two charges "shall meet the requirements of section 23." Id. at 443, 495 A.2d 434. Under section 23, the authority's total revenues must cover operating expenses and debt service. N.J.S.A. 40:14B-23. Although the authority contended that its "general powers" enabled it to impose a reservation fee, the court disagreed, noting that such a fee would cause the authority to secure more revenue than was statutorily contemplated. Hamilton Twp., supra, 202 N.J.Super. at 443, 495 A.2d 434.
The court also quoted from Airwick, supra, 57 N.J. at 121, 270 A.2d 18, in concluding that the annual sewer service charge authorized by the MCUAL is a "charge to ... the actual user of the system and does not contemplate a charge made against unimproved property." 202 N.J.Super. at 445, 495 A.2d 434. Noting the authority's concession that the "reservation fee" was, in reality, "an annual sewer service charge for reserving capacity for units that had not been constructed," the Appellate Division invalidated the reservation fee on the additional ground that Airwick precluded imposition of service charges on non-users. Id. at 446, 495 A.2d 434. See also Austin v. Mayor & Common Council of the Borough of Union Beach, 10 N.J. Misc. 670, 671, 160 A. 318 (Sup.Ct.1932) (holding that at common law municipality could not impose water service charges on non-users of its system).
Those judicial applications of the SAL in Airwick, supra, 57 N.J. 107, 270 A.2d 18, and of the MCUAL in White Birch, supra, 80 N.J. at 176, 402 A.2d 927, in Ivan, supra, 162 N.J.Super. at 468-69, 393 A.2d 598, and in Hamilton Township, supra, 202 N.J.Super. at 443-46, 495 A.2d 434, inform our understanding of the 1977 amendments to the MCUAL, L. 1977, c. 384. Those amendments empowered authorities organized under that statute to provide solid waste services in addition to sewer and water services. We note initially that although N.J.S.A. 40:14B-2, the Declaration of Policy provision of the statute, was amended specifically to permit authorities organized under the Act to engage in "the collection, disposal and recycling of solid waste," subparagraph (5) of that section retained the original statutory mandate that such solid waste services be rendered "at the expense of the users of such services or of counties or municipalities or other persons contracting for or with respect to the same." N.J.S.A. 40:14B-2(5) (emphasis added). The 1977 *677 amendments also added N.J.S.A. 40:14B-22.1, the section of the statute at issue in this appeal, to the MCUAL. Supra at 290-91, 753 A.2d at 673. Because the 1977 amendments for the first time included solid waste services within the powers conferred on authorities organized under the MCUAL, enactment of section 22.1 was necessary to confer on such authorities the power to impose solid waste service charges, analogous to the power previously conferred with respect to "water service charges," see N.J.S.A. 40:14B-21, and "sewerage service charges," see N.J.S.A. 40:14B-22. The critical language of the three statutory provisions merits comparison.
N.J.S.A. 40:14B-21 provides in part:
Such water service charges may be charged to and collected from any person contracting for such connection or use, products or services or for such sale or from the owner or occupant, or both of them, of any real property which directly or indirectly is or has been connected with the water system or to which directly or indirectly has been supplied or furnished such use, products or services of the water system or water or water services, facilities or products, and the owner of any such real property shall be liable for and shall pay such water service charges to the municipal authority at the time when and place where such water service charges are due and payable.
N.J.S.A. 40:14B-22 provides in part:
Such sewerage service charges may be charged to and collected from any person contracting for such connection or use or services or from the owner or occupant, or both of them, of any real property which directly or indirectly is or has been connected with the sewerage system or from or on which originates or has originated sewage or other wastes which directly or indirectly have entered or may enter the sewerage system, and the owner of any such real property shall be liable for and shall pay such sewerage service charges to the municipal authority at the time when and place where such sewerage service charges are due and payable.
N.J.S.A. 40:14B-22.1 provides in part:
Such solid waste service charges may be charged to and collected from any municipality or any person contracting for such use or services or from the owner or occupant, or both of them, of any real property from or on which originates or has originated any solid waste to be treated by the solid waste system of the authority, and the owner of any such real property shall be liable for and shall pay such solid waste service charges to the municipal authority at the time when and place where such solid waste service charges are due and payable.
Notably, N.J.S.A. 40:14B-22.1 is the only one of the three sections, by its use of the phrase "to be treated," to qualify expressly the power to impose a service charge on the condition that the authority render a future service with respect to the subject of the service charge.
We also note that the MCUAL specifically authorizes connection charges to be imposed in part to recapture debt service costs, but only with respect to sewer and water services, not solid waste services. See N.J.S.A. 40:14B-22 (authorizing sewer system connection fees that include a "fair payment" for debt service); N.J.S.A. 40:14B-21 (authorizing water system connecting fees that include a "fair payment" for debt service). Significantly, the provisions of N.J.S.A. 40:14B-21 authorizing water system connecting fees also were enacted pursuant to a 1977 amendment to the MCUAL, L. 1977, c. 441, and the Committee Statement to the Senate Bill that was enacted expresses the Committee's intent to authorize such connection fees in order to conform the water system provisions of the MCUAL to this Court's decision in Airwick, supra, 57 N.J. 107, 270 A.2d 18:

*678 The Assembly committee amendments to the bill were made at the request of the sponsor. The effect of the amendments is to establish a limitation on the amount of the connection or tapping fee to be charged. The fee shall not exceed the actual cost of the physical connection plus an amount representing the fair contribution of the connecting party toward the debt service charges on the bonds which were issued to contract the water system and were previously paid by users of the system. Under the previous language of the bill, the amount of the connection fee would be left to the discretion of the authority. The language contained in the committee amendment would conform the provisions of the bill to the decision of the N.J. Supreme Court in the Airwick case cited above.
[Assembly Municipal Government Committee Statement to Senate No. 69, Nov. 9, 1976 (L. 1977, c. 441) (Statement No. 69).]
Accordingly, our review of the provisions of the MCUAL in the context of this Court's decisions in Airwick, supra, 57 N.J. 107, 270 A.2d 18 and Meglino, supra, 103 N.J. 144, 510 A.2d 1134, reveals that sewer and water system debt service expense may be recovered either through annual service charges or connection fees, and that the combination of such annual service charges and connection fees must be sufficient to pay the authority's expenses of operation, maintenance, and debt service. See N.J.S.A. 40:14B-21, -22, and -23. In contrast, the only statutorily authorized revenue source for an authority providing solid waste servicesis the solid waste service charge, see N.J.S.A. 40:14B-22.1, which pursuant to N.J.S.A. 40:14B-23 is anticipated to provide sufficient revenue to cover expenses of operation, maintenance and debt service.

III
The critical issue before us is whether section 22.1 of the MCUAL authorizes the PCUA and similar solid-waste authorities to impose an EIC, in order to pay debt service covering facility-and service-related capital expenditures previously incurred, on municipalities and commercial waste generators that no longer use the PCUA's services or facilities. Familiar principles of statutory interpretation inform our analysis.
"The first step in any statutory analysis is to examine the statute's plain language as the clearest indication of its meaning." Bergen Commercial Bank v. Sisler, 157 N.J. 188, 202, 723 A.2d 944 (1999) (citing National Waste Recycling, Inc. v. Middlesex County Improvement Auth., 150 N.J. 209, 223, 695 A.2d 1381 (1997); accord State v. Szemple, 135 N.J. 406, 421, 640 A.2d 817 (1994); Merin v. Maglaki, 126 N.J. 430, 434, 599 A.2d 1256 (1992)). If the statutory language is clear and unambiguous, and susceptible to only one interpretation, courts should apply the statute as written without resort to extrinsic interpretative aids. Sisler, supra, 157 N.J. at 202, 723 A.2d 944.
If conflicting interpretations of a statute are plausible, a reviewing court should not regard that statute's meaning to be self-evident. National Waste, supra, 150 N.J. at 223, 695 A.2d 1381. Concerning the statutory language at issue, the Appellate Division concluded that "the EIC qualifies as a solid waste service charge pursuant to the Municipal and Counties Utilities Authorities Law." 321 N.J.Super. at 207, 728 A.2d 323. In contrast, we noted earlier, supra at 289, 753 A.2d at 672, that in the pending litigation challenging the EIC imposed by the Atlantic County Utilities Authority the Chancery Division preliminary concluded that the EIC "does not appear to be authorized by statute." Although plaintiffs forcefully contend that the plain language of section 22.1 reflects a clear legislative intent to restrict the imposition of solid waste service charges to current users of an authority's services, we are *679 persuaded that, in view of the conflicting interpretations of the statute, we should regard it as ambiguous and susceptible to more than one interpretation.
Accordingly, in construing the statute we may rely on extrinsic aids such as legislative intent and prior precedent, if available. Sisler, supra, 157 N.J. at 205, 723 A.2d 944. In discharging our interpretative responsibility, we are admonished that "each part or section [of the statute] should be construed in connection with every other part or section so as to produce a harmonious whole," and that "it is not proper to confine interpretation to the one section to be construed." Norman J. Singer, Sutherland Statutory Construction § 46.05 at 103 (5th ed.1992). That principle of statutory interpretation is embedded in our decisional law. See State v. Sutton, 132 N.J. 471, 479, 625 A.2d 1132 (1993); Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129, 527 A.2d 1368 (1987); State v. A.N.J., 98 N.J. 421, 424, 487 A.2d 324 (1985); Brown v. Brown, 86 N.J. 565, 577, 432 A.2d 493 (1981).
As our detailed discussion of the integral provisions of the MCUAL reveals, the overarching statutory scheme that has been in effect since the statute's enactment is that the statutorily authorized service charges are to be imposed only on users. Section 2(5) of the original enactment, L. 1957, c. 183, the so-called "Policy" section of the statute, stated expressly that the sewer and water system services to be provided pursuant to the MCUAL were "at the expense of the users of such services or of counties or municipalities or other persons contracting for or with respect to the same." (emphasis added) After the statute was amended in 1977, L. 1977, c. 384, to authorize the provision of solid waste services, in addition to sewer and water system services, the amended version of N.J.S.A. 40:14B-2(5) reiterated that all such services were provided "at the expense of the users of such services or of counties or municipalities or other persons contracting for or with respect to the same."
This Court explicitly held in Airwick, supra, 57 N.J. at 122, 270 A.2d 18, construing the analogous provisions of the Sewer Authorities Law, and in White Birch Realty, supra, 80 N.J. at 176, 402 A.2d 927, expressly applying the Airwick holding to the MCUAL, that both statutes restricted imposition of service charges to users. The Court's explanation in Airwick was clear and unambiguous:
The periodic rent, rate, fee or charge provided by N.J.S.A. 40:14A-8(b) deals with the charge to be made to the actual user of the system and does not contemplate a charge made against unimproved property. Yet the unimproved property is benefited by the improvement, as above noted, and more specifically the unimproved property will benefit unfairly with respect to so much of the capital cost and interest thereon as may have been paid in the past by users of the sewer. The statute does not authorize a special assessment or any immediate charge against a non-user, but the statute by amendment does authorize "a separate charge in the nature of a connection fee or tapping fee ..."
The logical construction of the foregoing subsections is that the legislature intended that the installation and construction costs, i.e., debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they assume a fair share of the original construction costs when they become improved properties.
[Supra, 157 N.J. at 121-22, 723 A.2d 588.]
Shortly after our decision in Airwick, the Legislature amended the MCUAL to confer on authorities organized under that statute the same power to impose sewer *680 connection fees as previously existed under the SAL. Relying on that legislative implementation of the Airwick holding, we held in White Birch, supra, "that the principles enunciated in Airwick are equally applicable to municipal sewerage authorities created under N.J.S.A. 40:14B-1 to 69." 80 N.J. at 176, 402 A.2d 927.
The Legislature again signaled its acceptance of the Airwick principles when in 1977the same year it amended the MCUAL to authorize provision of solid waste servicesit amended section 21 of the MCUAL, N.J.S.A. 40:14B-1 to -78, to authorize imposition of water system connection fees, L. 1977, c. 441, and the accompanying Assembly Committee Statement confirmed that the intent of the amendment was to "conform the provisions of the bill to the decision of the N.J. Supreme Court in the Airwick case cited above." Statement No. 69.
The Airwick principle that only current users can be assessed service charges for sewer and water service, and that subsequent users can be assessed their fair share of debt service through connection fees, reflects the uniform and consistent understanding of the MCUAL's financing scheme, not only by the Legislature but also by the judiciary. The only published opinions construing the MCUAL so hold. In Ivan, supra, 162 N.J.Super. at 469, 393 A.2d 598, the Appellate Division held that the water service charge authorized by section 21 of the MCUAL could not be imposed on "nonusers of the system." In Hamilton Township, supra, 202 N.J.Super. at 446, 495 A.2d 434, the Appellate Division held that the sewer service charge authorized by section 22 of the MCUAL, could not be collected from non-users of the system.
As noted, supra at 297, 753 A.2d at 677, the provisions of N.J.S.A. 40:14B-22.1, authorizing solid waste service charges, parallel the corollary provisions of N.J.S.A. 40:14B-21 and 22 authorizing water and sewer service charges. Two distinctions are significant, however. The Legislature did not authorize imposition of a "connection fee" related to solid waste services, recognizing the obvious difference between sewer and water systems, on the one hand, which provide the sole centralized source for sewer and water to properties serviced by such systems, and solid waste systems, on the other hand, concerning which "[t]here is a thriving and competitive private solid waste industry ... that does not exist in the wastewater arena." LaRocca, supra, 17 Pace Envtl. L.Rev. at 156.
The second distinction is that N.J.S.A. 40:14B-22.1unlike sections 21 and 22 relating to water and sewer service chargesby its use of the phrase "to be treated," expressly appears to qualify an authority's power to impose a solid waste service charge by the requirement that the authority provide a future service with respect to the solid waste subject to the charge. We set forth the critical language once again:
Such solid waste service charges may be charged to and collected from any municipality or any person contracting for such use or services or from the owner or occupant, or both of them, of any real property from or on which originates or has originated any solid waste to be treated by the solid waste system of the authority, and the owner of any such real property shall be liable for and shall pay such solid waste service charges to the municipal authority at the time when and place where such solid waste service charges are due and payable.
[N.J.S.A. 40:14B-22.1 (emphasis added).]
In the context of the entire statutory scheme of the MCUAL that precludes sewer and waste service charges from being imposed on non-users, to construe the more restrictive statutory language of section 22.1 as permitting a service charge, in the form of an EIC, to be imposed on non-users would be illogical, anomalous, and incongruent with the consistent understanding *681 and application of the MCUAL's provisions during the past four decades. Such an interpretation is inconsistent with the statutory wording of section 22.1, and in our view would contravene our obligation to construe the entire statute in a manner that harmonizes its consistent parts. We are not willing to impute to the Legislature, which did not authorize sewer and water service fees to be imposed on non-users, an unexpressed intention to permit solid waste service fees to be so imposed.
The complex and unanticipated events that resulted in the invalidation of this State's carefully crafted system of solid-waste regulation and produced the need for a new funding source to address the stranded debt of counties and solid waste authorities is an even more compelling reason for concluding that section 22.1 does not authorize an EIC to be imposed on non-users of solid waste services. When construing an ambiguous statute, courts strive to give effect to probable legislative intent. National Waste Recycling, supra, 150 N.J. at 223, 695 A.2d 1381; Merin v. Maglaki, supra, 126 N.J. at 435, 599 A.2d 1256. The structure of the MCUAL, and the Legislature's enactment of comprehensive solid waste regulatory legislation in the early 1970s, informs us that the 1977 amendment to the MCUAL, L. 1977, c. 384, simply was intended to allow authorities organized under that statute to provide solid waste services, as well as sewer and water services. Neither a constitutional challenge to the validity of the state's regulatory system nor a crisis in the ability of solid waste authorities to pay debt service influenced in the slightest the 1977 legislative amendments to the MCUAL. To construe section 22.1 of the MCUAL as authorizing imposition of an EIC of approximately $30 per ton based on prior waste flow, on non-users of the PCUA's services, would sustain the strained and unintended application of a mundane 1977 statutory amendment to address an unanticipated statewide solid waste financial crisis that arose twenty years after the statute's adoption. No principle of statutory construction could condone so extraordinary an interpretation of N.J.S.A. 40:14B-22.1.
In view of its conclusion that an EIC is an authorized charge pursuant to section 22.1 of the MCUAL, 321 N.J.Super. at 209, 728 A.2d 323, the Appellate Division declined to decide whether the Local Finance Board independently could authorize the PCUA to impose an EIC. Ibid. We have no doubt that section 19 of the Local Authorities Fiscal Control Law, N.J.S.A. 40A:5A-1 to -27, confers no such power on the LFB. Rather, that statute empowers the LFB to order an authority experiencing financial difficulties that jeopardize the payment of debt service to implement a financial plan that "will assure the payment of debt service on obligations of the authority," but its provisions do not enable the LFB to empower an authority to supersede existing statutory law. We agree with the DEP's characterization of that statute in its Third Circuit brief in Atlantic Coast II when it observed that the statute "does not itself provide the solution but only the procedural mechanism for addressing the problem."
Plaintiffs also challenge the legality and constitutionality of the 1997 Deficiency Agreement pursuant to which Passaic County agreed, in effect, to guarantee the PCUA's debt service obligations relating to approximately $21.7 million of the 1991 series revenue bonds which, when issued, were unsecured by any County guaranty. The PCUA's application to the LFB contemplated the issuance of 1997 Refunding Bonds intended in part to refinance $21.4 million of the unsecured Series 1991 Revenue Bonds, and a later amendment to the application sought approval of the PCUA's supplemental application to increase the amount of 1997 refunding bonds by $6.5 million in order that Passaic County would guarantee the balance of the 1991 Revenue Bonds to be refunded. The Appellate Division sustained the legality *682 and constitutionality of the 1997 Deficiency Agreement. 321 N.J.Super. at 210-15, 728 A.2d 323.
Plaintiffs contend that the bondholders of the 1991 Revenue Bonds will receive an unauthorized windfall if the County's guaranty of those bonds pursuant to the 1997 Deficiency Agreement is sustained. Plaintiffs assert that those bonds received "only a BAA-1 rating by Moody's when they were issued" and that their current rating is "below investment grade and similar to that of a junk bond." They contend that the 1997 Deficiency Agreement significantly enhances the value of the 1991 Revenue Bonds while simultaneously placing the County's own credit rating at risk. Finally, they assert that the 1997 Deficiency Agreement violates the donation clause of the constitution, constituting an unconstitutional gift to the bondholders at public expense. N.J. Const., art. VIII, § 3.
We need not address plaintiff's constitutional contentions because the record is clear that Passaic County's execution of the 1997 Deficiency Agreement was conditioned on the approval and validity of the EIC. The PCUA's application to the LFB for approval of its financial plan expressly stated that the revenue from the EIC "is expected to be sufficient to pay the debt service on all the Authority's outstanding obligations." At oral argument counsel for the intervenors and for the LFB acknowledged the inextricable connection between the anticipated validity of the EIC and the County's execution of the 1997 Deficiency Agreement. Absent a valid and collectible EIC, Passaic County would in all likelihood become the primary source of debt service payments on the 1997 Refunding Bonds. Because the 1997 Deficiency Agreement was dependent on the validity of the proposed EIC, both as between the parties and as a component of the PCUA's refinancing application to the LFB, we hold that the agreement itself is invalid and unenforceable. We do not consider whether the County validly could enter into an agreement to guarantee debt service on the 1991 Revenue Bonds without a valid EIC to provide a revenue source for payment of that debt service.
We also note that, with the exception of the Series 1991 Revenue Bonds, all or substantially all of the PCUA's outstanding debt is, in effect, guaranteed by Passaic County pursuant to an earlier Deficiency Agreement. Accordingly, with respect to that otherwise guaranteed outstanding PCUA debt, the practical effect on Passaic County of the invalidation of the EIC is to shift the burden of funding the PCUA's debt service from a levy based on waste flow to one based on property valuations. From Paterson's perspective, its financial burden will be lessened because its property valuations, compared to other Passaic County municipalities, are proportionately lower than its 1996 waste flow.

IV
In holding invalid both the PCUA's imposition of an EIC on non-users of its services and facilities, as well as the 1997 Deficiency Agreement, we fully recognize the complexity and significance of the stranded debt problem that the EIC was intended to address. We appreciate that the Executive branch agencies that recommend implementation of an EIC did so in a good-faith attempt to ameliorate, if not resolve, an unanticipated financial crisis of unprecedented magnitude. We also acknowledge that the absence to date of a comprehensive legislative resolution of the problem undoubtedly reflects the tensions of the competing interests, illustrated in this appeal by the preference of suburban municipalities for a financing mechanism based on solid waste flow and Paterson's preference for a financing mechanism based on property valuations. Because of the underlying complexity of and variations in the issues presented in the various counties that have imposed EICs, we accord little weight to the argument that the Legislature's silence signals its acquiescence concerning the imposition of EICs. That silence, in our *683 view, more likely reflects the elusiveness of a legislative resolution of the problem. Notwithstanding the complexity of the issues, legislative intervention appears to be essential, and in any event is decidedly preferable to reliance on a 1977 statutory amendment that was never intended to address these perplexing financial issues of statewide importance.
We reverse the judgment of the Appellate Division. We will stay the effective date of our judgment for ninety days to provide an opportunity for legislative action.
LONG, J., dissenting.
I would affirm the judgment of the Appellate Division upholding the EIC for the reasons expressed in the thorough and thoughtful opinion of Judge Cuff. 321 N.J.Super. 186, 728 A.2d 323 (1999). The issue here is straightforward: whether N.J.S.A. 40:14B-22.1, a statute that the majority acknowledges is "ambiguous and susceptible to more than one interpretation," ante at 300, 753 A.2d at 679, can sustain the construction impressed upon it by the Passaic County Utilities Authority (PCUA), the Local Finance Board (LFB), the Department of Environmental Protection (DEP) and the Appellate Division. In my view it can, and I would thus adopt the Appellate Division's statutory analysis.
What this case boils down to is a parsing of the language of N.J.S.A. 40:14B-22.1 addressing who can be burdened with a service charge. The exact language is as follows:
Such solid waste service charges may be charged to and collected from any municipality or any person contracting for such use or services or from the owner or occupant, or both of them, of any real property, from or on which originates or has originated any solid waste to be treated by the solid waste system of the authority.
[N.J.S.A. 40:14B-22.1 (emphasis added).]
One side focuses on the words "to be treated," contending that they allow a service charge only upon those whose present or past waste is to be treated in the future, in other words, present users, of which there are none. The other focuses on the "originates or has originated" language, arguing that it includes in the category of payors anyone who was a past user of the system (i.e., one who owns property that, at some prior time, produced waste to be treated by the system).
To be sure, decent arguments can be constructed on either side of this issue, although neither is flawless. That is what happens when a statute is ambiguous. The Appellate Division took one plausible approach. In doing so, it persuasively observed that the decision in Airwick Indus., Inc. v. Carlstadt Sewerage Auth., 57 N.J. 107, 113-114, 270 A.2d 18 (1970), on which the majority's entire statutory analysis is predicated, "provides more support for the PCUA's position than plaintiff's position" and "recognizes the need to cover debt occasioned by withdrawal or cessation of activities." In re Passaic County Utilities Authority, supra, 321 N.J.Super. at 205, 728 A.2d 323.
The Appellate Division decision honors the interpretation by the executive branch, as articulated by the PCUA, the LFB and the DEP, and has the effect of carrying out the LFB's mission of averting a debt crisis. There is no reason why we should adopt an equal (not better) interpretation that would have the effect of creating a fiscal emergency and compelling legislative intervention.
I note that there was a flurry of ambiguous legislative activity when this problem surfaced; bills that can support either side of the legislative intent argument were proposed. See, e.g., "Assembly Panel Stymied Over Waste Flow Control Laws," The Record, May 13, 1997. However, as soon as the EIC remedy was crafted, legislative attempts at addressing the problem essentially ceased. Unlike the majority, I *684 am not willing to assume that the Legislature's inaction resulted from its view of the problem as complex and intractable.
On the contrary, I believe it is fair to assume that if the Legislature thought the EIC remedy was either inadvisable or unauthorized, it would have stepped in and taken action. Presumably, the reason it did not do so is that it viewed the EIC remedy as an appropriate and lawful approach to the stranded debt problem, thus making legislative ratification unnecessary. That point is all the more compelling in the face of the notable absence in the majority opinion of even a hint that the EIC remedy is beyond the Legislature's power. If it is not, all that the majority opinion can accomplish is the creation of a fiscal catastrophe, with forced legislative action, followed potentially by the same EIC remedy that is now before us. No good end will be served by such a process. The majority may hope that the Legislature will take a different course, but such a hope does not justify its decision to invalidate one viable approach to the problemcharging those who were in the consumer pool and for whom provisions had to be made when the planning costs for the waste disposal facility were incurred.
The majority holds that the stranded debt problem probably was not contemplated by the Legislature when it enacted N.J.S.A. 40:14B-22.1, and that the Appellate Division shoehorned it into a statutory scheme that it was never meant to address. That may well be so. However, on repeated occasions, we have interpreted constitutional and statutory provisions to accommodate necessary solutions to present-day problems, even though those problems may have been unanticipated at the time the provisions were enacted. See Whelan v. New Jersey Power & Light Co., 45 N.J. 237, 251, 212 A.2d 136 (1965) (noting that although Legislature likely did not contemplate type of agreement at issue, the Court ought not assume that Legislature intended its grant of authority to enter such agreements to be constrained by the state of technology at the time of enactment). It is a bedrock canon of statutory construction that a court will search for ways to uphold the actions of the coordinate branches of government, particularly when agency expertise is involved. See, e.g., Smith v. Penta, 81 N.J. 65, 75, 405 A.2d 350 (1979) ("It is the settled rule of judicial policy in this jurisdiction that a legislative enactment will not be declared void unless its repugnancy to the Constitution is so manifest as to leave no room for reasonable doubt."); Mayflower Sec. Co. v. Bureau of Securities, 64 N.J. 85, 92-93, 312 A.2d 497 (1973) (confirming that review of agency findings is limited to determining whether findings are supported by sufficient credible evidence, giving due regard to agency's expertise). We should not reject such precedent here.
Chief Justice PORITZ and Justice VERNIERO join in Justice LONG's opinion.
For reversalJustices O'HERN, STEIN, COLEMAN and Judge PRESSLER, temporarily assigned4.
For affirmanceChief Justice PORITZ and Justices LONG and VERNIERO3.
NOTES
[1] By virtue of L. 1970, c. 209, enacted between oral argument and decision of the Airwick appeal, both the SAL and the MCUAL were amended to authorize the use of special benefit assessments to finance construction of sewerage and water facilities. A 1977 amendment, L. 1977, c. 384, authorized the use of special benefit assessments for solid waste facilities. See N.J.S.A. 40:14A-9 and N.J.S.A. 40:14B-24.